2012 CO 51

**The PEOPLE of the State of Colorado,
Plaintiff–Appellant**

v.

**Erick Wozbely FIGUEROA–ORTEGA,
Defendant–Appellee.**

**No. 12SA78.**

Supreme Court of Colorado,
En Banc.

June 25, 2012.

Carol Chambers, District Attorney, Richard H. Orman, Senior Deputy District Attorney, Centennial, Colorado, Attorneys for Plaintiff–Appellant.

Douglas K. Wilson, Public Defender, Andrew E. Ho, Deputy State Public Defender, Centennial, Colorado, Attorneys for Defendant–Appellee.

Justice COATS delivered the Opinion of the Court.

¶ 1 The People brought an interlocutory appeal pursuant to section 16–12–102(2), C.R.S. (2011), and C.A.R. 4.1, challenging the district court's suppression of statements made by the defendant to a police detective. The district court found that the statements in question were the product of custodial interrogation, without the benefit of *Miranda* warnings. Because we determine that the defendant was not in custody at the time he made the statements in question, the district court erred, and its suppression order is therefore reversed.

## I.

¶2 Erick Figueroa-Ortega was charged with burglary, criminal mischief, and theft, in connection with a break-in at the restaurant where he worked as a cook. Counsel for the defendant filed a motion to suppress the statements he made to the police and other evidence on the grounds that the statements were the fruits of an illegal seizure of the defendant; that the statements were involuntary in any event; and that the statements were taken in violation of the defendant's *Miranda* rights. Although the motion did not specify any particular statements to be suppressed, it made reference to two different law enforcement contacts with the defendant—one on September 13, 2009, the morning following the break-in, and the other on September 23, ten days later—alleging that the defendant had been subjected to custodial interrogation, during which he made "many involuntary inculpatory statements."

¶3 Following a hearing on March 12, 2012, at which the only witnesses were the officer who spoke with the defendant on September 13 and the officer who spoke with him on September 23, the trial court made findings of fact and conclusions of law. It was undisputed that Officer Patton of the Aurora Police Department arrived at the scene of the reported burglary on the morning of September 13, 2009, observed that the front glass door of the restaurant was smashed, and learned from the owners that cash from the previous night was missing. The officer also had a short conversation with the defendant, who had apparently shown up at the scene, in which the defendant indicated that he was a cook at the restaurant, that he had worked the night before, and that he was the one who closed up at the end of the night.

¶4 During his subsequent investigation, Detective Crowfoot learned that the church next door had a surveillance camera, which had recorded the outside of the restaurant on the night of the burglary. The video from the church camera, which showed the restaurant being locked up about 11:00 p.m. and being broken into a few hours later, was shown to several different people, including one of the restaurant owners and an employee of the church, who identified both the person who locked up and the person who broke in hours later as the defendant. On September 23, Detective Crowfoot went to the defendant's apartment and spoke with him for about twenty minutes, in the open just outside his front door. Although the detective confronted the defendant at some point with this evidence, accused him of committing the burglary, and told him that he would be charged, the defendant steadfastly denied any involvement. During the exchange, however, the defendant did concede that he went back to the restaurant after locking up, although only to move his truck, and that he knew where the money from the day's receipts was kept each night. After about twenty minutes, the detective thanked the defendant for his time and left.

¶5 The trial court made detailed factual findings and conclusions of law, first denying the defendant's challenge to the voluntariness of the statements he made on September 13. With regard to the defendant's statements to Detective Crowfoot on September 23, the court similarly found that the defendant had not been seized at all, much less that he had been seized without reasonable articulable suspicion, and that his statements to Detective Crowfoot were not involuntary. The court then found, however, that at some point between eight and nine minutes into the interview, it became accusatory and confrontational, constituting "custody" for purposes of the *Miranda* doctrine. Because there was never any dispute that the defendant's statements were made in response to questions by the detective or that the defendant was never advised of, and therefore never effectively waived, his *Miranda* rights, the trial court ordered all of the defendant's statements to Detective Crowfoot on September 23 suppressed as a violation of his constitutional rights.

¶6 The prosecutor filed a notice of interlocutory appeal, pursuant to section 16–12–102, C.R.S. (2011), and C.A.R. 4.1.

## II.

¶7 While due process of law forbids the use of any statements that were actually coerced by law enforcement authori-

ties, *Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936), the prophylactic warnings formulated in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), apply only to custodial interrogation. Because the *Miranda* warnings were expressly developed as an added protection against "incommunicado interrogation of individuals in a police-dominated atmosphere," *id.* at 445, 86 S.Ct. at 1612, the United States Supreme Court made clear, more than a quarter century ago, that by "custodial" it intended not merely that a suspect have been seized within the contemplation of the Fourth Amendment, but that his liberty actually have been infringed upon to a degree associated with a formal arrest. *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984); *see also Minnesota v. Murphy*, 465 U.S. 420, 429, 104 S.Ct. 1136, 1143, 79 L.Ed.2d 409 (1984); *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983). While the point at which official infringement rises to a degree associated with a formal arrest, and therefore mandates a *Miranda* warning, remains a matter to be determined in the totality of the circumstances of each case, *People v. Klinck*, 259 P.3d 489, 493 (Colo. 2011), "custody" for purposes of *Miranda* clearly entails some degree of infringement on an individual's liberty exceeding a minimally cognizable constitutional seizure.

¶ 8 Because interrogation can be custodial only if the person being interrogated has at least been stopped, the non-exclusive list of factors frequently identified as bearing on the question of whether a reasonable person would no longer feel free to leave, and therefore whether he has been seized at all, remains relevant for *Miranda* purposes. *See People v. Matheny*, 46 P.3d 453, 465–66 (Colo.2002). Because, however, that general list of factors was actually developed to determine whether an encounter with law enforcement officers has ceased to be consensual and therefore has progressed beyond a contact short of a stop to a constitutionally cognizable investigatory stop, *see United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *see also People v. Pancoast*, 659 P.2d 1348, 1350 (Colo.1982), both this court and the Supreme Court have emphasized more specifically those infringements on liberty typically distinguishing a mere investigatory stop from an arrest. By way of example, we have previously found that, although not dispositive, drawn guns and physical restraints like the use of handcuffs are more typically associated with an arrest than a mere stop, *see People v. Breidenbach*, 875 P.2d 879 (Colo.1994), and that making clear to a detainee that he will not be released after a short investigatory stop is similarly indicative of an arrest, *see People v. Polander*, 41 P.3d 698, 705 (Colo.2001). In *Berkemer* itself, the Supreme Court emphasized the importance, from a detainee's perspective, of being removed to a secluded place, even if only a patrol car, rather than being questioned in public view, as would be more typical of an investigatory stop. 468 U.S. at 438, 104 S.Ct. at 3149.

■ ¶ 9 In the instant case, the trial court made detailed findings of historical fact with regard to each of the general factors we have previously enumerated. Significantly, most of those findings were more indicative of a consensual encounter than a constitutionally cognizable stop—as for instance the short duration of the interview and the fact that it was conducted in broad daylight and public view, by a single officer in civilian clothes, who neither offered any show of force nor restricted the defendant's freedom of movement in any way, and who made no threats or promises or demands. In addition, however, the trial court actually concluded from these findings that during the interview the defendant was *not* seized for purposes of the Fourth Amendment. Rather, the trial court equated an "accusatory interrogation" with a "custodial interrogation," finding that once the detective confronted the defendant with the evidence against him, indicated his confidence in the defendant's guilt and that he was merely seeking a confession, and told the defendant that he would be charged for the burglary, *Miranda* warnings were required.

■ ¶ 10 The extent to which a police officer's tone of voice and demeanor can be characterized as confrontational and accusatory is more typically relevant to the determination whether an encounter is consensual

or is more appropriately categorized as one in which a reasonable person would feel he was not free to leave. And while notifying a person who has already been seized that he will be charged with an arrestable offense before being released may well elevate the seizure beyond an investigatory stop, merely confronting a suspect with the evidence against him and threatening, no matter how confidently, to charge him with a crime at some point in the future does not, by itself, constitute an infringement on his liberty, much less the kind of infringement associated with a formal arrest. The trial court in this case did not find that the defendant was told he would not be released, nor would such a finding have been supported by the record. Instead it merely categorized the detective's statement that the defendant would be charged, along with his belief that the defendant committed the crime, his confrontation of the defendant with the other evidence against him, his accusatory tone, and his apparent purpose of obtaining a confession, as an indication of "custodial interrogation."

¶ 11 Although the trial court drew a clear distinction between "custody" for purposes of the Fourth and Fifth Amendments, its conclusion, from the same historical findings of fact, that the defendant was in custody for purposes of *Miranda* while not even stopped within the meaning of the Fourth Amendment bespeaks a confusion about the two standards that undermines the court's ultimate suppression ruling. Because the question whether particular historical facts amount to custodial interrogation is primarily a matter of law, however, we determine from the trial court's findings of fact that under the correct legal standard, the defendant's statements to Detective Crowfoot on September 23 were not the product of custodial interrogation.

### III.

¶ 12 Because we determine that the defendant was not in custody at the time he made the statements in question, the district court erred in finding them to have been taken in violation of *Miranda*, and its suppression order is therefore reversed.