2013 CO 18

**The PEOPLE of the State of Colorado, Plaintiff–Appellant:**

v.

**Dimitry PLESHAKOV, Defendant– Appellee**

**Supreme Court Case No. 12SA236**

Supreme Court of Colorado.

March 25, 2013

*Interlocutory Appeal from the District Court* Arapahoe County District Court Case No. 10CR1831, Honorable Valeria N. Spencer, Judge

Carol Chambers, District Attorney, Eighteenth Judicial District Andrew Cooper, Chief Deputy District Attorney, Centennial, Colorado, Attorneys for Plaintiff–Appellant.

The Noble Law Firm, LLC Antony M. Noble, Lakewood, Colorado, Attorneys for Defendant–Appellee.

**Order Reversed**

JUSTICE HOBBS delivered the Opinion of the Court.

¶ 1 In this interlocutory appeal, the prosecution challenges an order of the Arapahoe County District Court granting defendant Dimitry Pleshakov's motions to suppress evidence and statements.[1]  The district court

---

1. The prosecution presents the following two issues for review:

   A. [Whether] [t]he district court erred in suppressing the defendant's statements: at that point in the encounter, no *Miranda* warning was required, because the defendant was not "in custody."

   B. [Whether] [t]he district court erred in suppressing physical evidence: where statements are voluntary, a lack of *Miranda* warnings does not justify suppression of the statements' physical fruits.

concluded that Pleshakov's incriminating statements were the product of an illegal interrogation without the benefit of *Miranda* warnings. The court suppressed these statements, as well as evidence later obtained from Pleshakov's apartment, as fruit of the poisonous tree. We hold that Pleshakov was not subjected to custodial interrogation at the time he made the statements in question. Accordingly, we reverse the district court's suppression order.

## I.

¶ 2 At approximately 5:00 p.m. on August 7, 2010, police received a complaint from an anonymous citizen caller that a possible drug deal was taking place in the parking lot of an apartment complex located on East Mansfield Avenue in Aurora, Colorado. The caller provided descriptions of at least two cars involved in the exchange and identified a particular apartment as being related to the interaction. Officers traveled to the scene and initiated traffic stops of two cars matching the caller's descriptions as they were driving from the vicinity.

¶ 3 The driver of the first vehicle was in possession of marijuana. He told officers he had just purchased the marijuana at the residence in question from a man named "Dimitry." He further stated he had purchased marijuana at this location on numerous occasions, there were currently people inside the apartment smoking marijuana, and Dimitry also "used" methamphetamine and heroin. The driver of the second vehicle similarly told officers she had just left Dimitry's apartment, where she paid him forty dollars she owed from a previous marijuana purchase. Additionally, she stated she bought marijuana from Dimitry several times and described a specific drawer in Dimitry's kitchen where he typically kept the marijuana. She also described a white Dodge Neon associated with the apartment.

¶ 4 Based on the information provided by these two individuals, Sergeant Stephen Redfearn of the Aurora police department–who had spoken directly with both drivers–asked a fellow officer to visually monitor the Mansfield apartment and the white Dodge Neon. Shortly thereafter, the officer observed a man and two women leaving the apartment, entering a white Neon, and driving from the premises. Sergeant Redfearn responded to the scene and initiated a traffic stop approximately two to three blocks from the Mansfield residence. He stopped the vehicle based on a window tint violation and his belief that the car's occupants were likely involved in marijuana usage or distribution.

¶ 5 When stopping the vehicle, Sergeant Redfearn activated his patrol car lights but did not use his sirens. Officer Bugge stood behind the car as Sergeant Redfearn approached the driver's side window. Sergeant Redfearn asked the driver for her driver's license, registration, and insurance, none of which she had in her possession. Sergeant Redfearn then asked if anyone in the car had identification. The defendant, who was sitting in the front passenger seat, handed over a license identifying himself as Dimitry Pleshakov. While this interaction was ongoing, Officer Bugge witnessed a female passenger in the back of the vehicle appearing to shove an object, which he believed was a marijuana pipe, beneath the seat. He immediately informed Sergeant Redfearn of his observation.

¶ 6 Based on Officer Bugge's observation and the driver's failure to provide a driver's license, registration, or insurance, Sergeant Redfearn ordered everyone out of the car. He directed the three persons to step to the back of the vehicle and sit down on the sidewalk. The officers patted the car's occupants down for weapons. They found no weapons. At some point during this interaction, two additional officers arrived. Sergeant Redfearn determined the driver of the vehicle had an arrest warrant outstanding.

¶ 7 Sergeant Redfearn asked the defendant to stand up and step away from the other two individuals. He then engaged Pleshakov in conversation regarding the alleged marijuana dealing. Specifically, he told Pleshakov that the police had multiple sources saying Pleshakov was selling marijuana out of his apartment and there was currently marijuana inside the apartment. Pleshakov admitted there was some marijuana in his apartment but did not admit to

selling marijuana. The tone of this exchange was conversational, Pleshakov was not handcuffed, and no force was used against him. Although there were an estimated four officers total at the scene, Sergeant Redfearn and Pleshakov spoke alone[2] for a period of ten minutes or less. All of the officers present were armed and in uniform. At no point during this exchange did Sergeant Redfearn read Pleshakov his *Miranda* rights. At the suppression hearing, Sergeant Redfearn testified that Pleshakov would not have been free to leave had he attempted to do so.

¶ 8 Sergeant Redfearn asked for Pleshakov's consent to search the apartment. He told Pleshakov that, although he believed the police had probable cause to obtain a search warrant, it would likely be easier for everyone involved if Pleshakov consented to the search. He also suggested that, if officers found only a small amount of marijuana inside the apartment, Pleshakov would likely just receive a ticket. Pleshakov said he would give his consent but expressed concern about a gun located inside a safe within the apartment.

¶ 9 Sergeant Redfearn presented Pleshakov with an official "consent to search" form, inquired whether he was under the influence of drugs or alcohol, and verified that he was able to clearly read and write English. Sergeant Redfearn also explained that Pleshakov had the right not to give his consent and wrote "you have the right to refuse consent" on the form itself. Sergeant Redfearn then read the form aloud to Pleshakov as Pleshakov followed along, asked him whether he had any questions, and observed him sign the bottom of the form. Pleshakov also initialed beside Sergeant Redfearn's handwritten right-of-refusal statement.[3]

¶ 10 Pleshakov asked to be present during the search, and Sergeant Redfearn assented. Officers placed Pleshakov in the back of the police car and drove the short distance to the apartment. Pleshakov used his key to allow the officers to enter the premises. Sergeant Redfearn, along with at least two other officers, accompanied Pleshakov into the apartment. Upon entry, Pleshakov directed the officers to a safe located inside a back closet where he kept a firearm. Pleshakov gave officers a key to the safe and officers recovered the weapon.

¶ 11 Pleshakov and the officers then walked through the apartment together. Officers observed an apparent marijuana-preparation area in the kitchen, including a coffee can filled with marijuana buds, scissors, and marijuana residue on the counter. Officers also opened a drawer in the kitchen that Pleshakov told them contained marijuana; however, there was no marijuana inside the drawer and Pleshakov stated that someone must have "jacked" it. Finally, officers recovered an Oxycontin pill.

¶ 12 Following their search of the apartment, officers took Pleshakov into custody, placed him in handcuffs, and transported him to the Aurora municipal jail. Sergeant Redfearn estimated that Pleshakov's encounter with the police, from the time of the initial stop to his arrival at the jail, lasted approximately an hour and a half. Once at the jail, Pleshakov was released from his handcuffs and taken to a booking area where he spoke with Officer Sloan. Officer Sloan advised Pleshakov of his *Miranda* rights orally and in writing. Pleshakov said he understood his rights and signed an advisement of rights form. He then made additional statements, including a handwritten statement. Pleshakov was charged with possession with intent to distribute marijuana, conspiracy to distribute marijuana, possession of less than one gram of a Schedule II controlled substance, and possession of a weapon by a previous offender.

¶ 13 Pleshakov filed three motions to suppress, alleging that (1) the officers lacked

---

**2.** Pleshakov contends that Officer Sloan's suppression hearing testimony suggests he was also involved in the sidewalk interaction between Pleshakov and Sergeant Redfearn. However, the trial court's findings imply that the exchange took place between Pleshakov and Sergeant Redfearn alone. The transcript of the suppression

hearing supports this finding, and we will not disturb it on appeal.

**3.** Sergeant Redfearn also obtained consent to search the apartment from the vehicle's driver after being informed that she shared the residence with Pleshakov.

reasonable suspicion to initiate a traffic stop of the white Dodge Neon, and the subsequent interaction constituted an illegal detention; (2) the officers subjected Pleshakov to custodial interrogation without the benefit of *Miranda* warnings; (3) his statements to the officers were involuntary; and (4) his consent to search the apartment was involuntary and therefore invalid. The trial court held a suppression hearing on the motions in which it concluded that the traffic stop was proper and the officers had reasonable suspicion to subject Pleshakov to an investigatory detention. However, the court found that Sergeant Redfearn was required to read Pleshakov his *Miranda* rights prior to the sidewalk interrogation, and any statements made during this exchange must be suppressed. The court concluded that, although Pleshakov's statements to Sergeant Redfearn during the traffic stop and subsequent walk-through of his apartment were voluntary, they were a product of the illegal interrogation and should likewise be suppressed. Further, because Pleshakov gave his consent to search the apartment as part of this interaction, the court concluded that anything seized from the search must be suppressed as fruit of the poisonous tree. Finally, the court concluded that Pleshakov's later statements made at the Aurora police station were sufficiently attenuated to permit their introduction into evidence.

¶ 14 The prosecution filed a notice of interlocutory appeal pursuant to C.A.R. 4.1, contending that the trial court wrongly applied Fourth Amendment search and seizure standards to a Fifth Amendment inquiry, incorrectly concluded that Pleshakov was subject to custodial interrogation, and misapplied well-established law in suppressing the physical evidence found in Pleshakov's apartment as fruit of the poisonous tree.

## II.

¶ 15 We hold that Pleshakov was not subjected to custodial interrogation at the time he made the statements in question. Accordingly, we reverse the district court's suppression order.

### A. "Custodial Interrogation" Standard of Review

¶ 16 A trial court's determination whether a suspect was subjected to custodial interrogation is a mixed question of law and fact. *People v. Elmarr*, 181 P.3d 1157, 1161 (Colo.2008). We defer to the trial court's findings of historical fact and will not overturn those findings if they are supported by competent evidence in the record. *Id.*; *People v. Guthrie*, 2012 CO 59, ¶ 10, 286 P.3d 530, 533. We review de novo the legal question whether those facts, taken together, establish that the suspect was in custody when interrogated. *Elmarr*, 181 P.3d at 1161. Our analysis is not constricted by only those facts that were the subject of the trial court's order; we also consider the undisputed facts evident in the record. *Id.*; *Guthrie*, ¶ 10.

### B. Applicable Law

¶ 17 As a threshold matter, the prosecution argues that the trial court incorrectly applied a Fourth Amendment search and seizure standard to a Fifth Amendment inquiry in granting Pleshakov's motion to suppress based on lack of a *Miranda* advisement. Pleshakov responds that the trial court correctly distinguished between Fourth and Fifth Amendment standards in concluding that Pleshakov was subject to custodial interrogation. In reviewing the transcript of Pleshakov's suppression hearing, both parties' positions find some support in the record.[4] Because we review the trial court's

---

4. The relevant portion of the transcript identified by the People reads:

> Court: This is not–as I've said, this is not just an investigative stop. When he decides, "This is my guy" and he removes him from the other people– I'm not saying the detention was illegal, but I'm saying it was a detention and it was subject at that point to Miranda and he didn't Mirandize him.

Here, the trial court appears to conflate the concept of "detention" for Fourth Amendment pur-

poses with the standard for custodial interrogation under the Fifth Amendment. At other points in the court's oral findings on the record the court specifically refers to custodial interrogation:

> Court: Now, having said all that, so now they've got him appropriately. At that point, I do think that we have gone past the point where they can just question him for some investigative purpose. And, again, it's a little

ruling de novo and hold that Pleshakov was not subject to custodial interrogation for purposes of the Fifth Amendment inquiry, we need not determine which standard the court utilized in granting Pleshakov's motion to suppress.

¶ 18 Pleshakov does not contest the trial court's determination that the initial stop was proper and Sergeant Redfearn subjected Pleshakov to a lawful investigative detention. We therefore turn to the issue of custodial interrogation.

■ ¶ 19 The Fifth Amendment to the United States Constitution guarantees that "no person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Protection of individuals' rights against self-incrimination requires law enforcement officers to advise persons subject to custodial interrogation that they have the right to remain silent; that anything they say may be used against them; that they have the right to the presence of an attorney; and that, if they cannot afford an attorney, one will be appointed for them. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Failure to provide these warnings and obtain a waiver of the subject's rights will preclude admission of his statements into evidence in a subsequent criminal prosecution. *People v. Matheny,* 46 P.3d 453, 462 (Colo.2002).

■ ¶ 20 A "custodial" detention entails a greater restriction on freedom than that associated with investigative detentions under the Fourth Amendment. Under the Fourth Amendment, a seizure results when a reasonable person would not have felt "free to leave" or otherwise terminate an encounter with law enforcement. *People v. Stephenson,* 159 P.3d 617, 620 (Colo.2007). By contrast, "custody" for *Miranda* purposes requires a suspect's liberty to be infringed upon to a degree associated with formal arrest. *People v. Pittman,* 2012 CO 55, ¶ 7,

284 P.3d 59, 61 ("The standard for determining whether a person is in custody for Miranda purposes is ... whether 'a reasonable person in the defendant's position would consider himself to be deprived of his freedom of action to the degree associated with a formal arrest.' " (quoting *Matheny,* 46 P.3d at 468)); *People v. Figueroa–Ortega,* 2012 CO 51, ¶ 7, 283 P.3d 691, 693. Nonexclusive factors courts consider in determining whether an interrogation was custodial in nature include:

> (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions.

*Matheny,* 46 P.3d at 465–66. None of these factors alone is determinative. The court considers the totality of the circumstances surrounding the defendant's encounter with law enforcement. *Stephenson,* 159 P.3d at 620; *Elmarr,* 181 P.3d at 1162.

¶ 21 In *People v. Stephenson,* we rejected a claim of custody where the trial court suppressed statements the defendant made during a traffic stop. 159 P.3d 617. We determined the defendant was not in custody when an officer asked him to wait beside a bridge during a consensual search of his car, retained his driver's license, and questioned him regarding a baggie of methamphetamine found inside the vehicle without first administering *Miranda* warnings. *Id.* at 619–20. We noted the officer placed no physical restraints on the defendant, and–because the

---

bit nuanced, but I think that what we have really is a custodial situation. It's a custodial interrogation. And when Sergeant Redfearn elected not to Mirandize Mr. Pleshakov, he did a constitutional failure.

The trial court also engaged in discussion of several factors typically associated with custodial interrogation analysis, including the number of

officers present, whether they were armed or brandished their weapons, the use of force, and the tone of the conversation between Sergeant Redfearn and Pleshakov. Given the court's reliance on both Fourth and Fifth Amendment terminology, it is unclear which standard the court applied in granting Pleshakov's motion to suppress.

defendant had denied ownership of the vehicle, a fact that the officer confirmed during the course of the stop–it was not immediately apparent that the contraband belonged to him. *Id.* at 622–23. Accordingly, it was not evident there were grounds to arrest him or that he would be arrested. *Id.* at 623. Under these circumstances, a reasonable person in the defendant's position would not have believed he was restrained to a degree tantamount to a formal arrest. *Id.* Other cases have similarly focused on the degree of physical restraint employed by officers in determining whether a suspect was in custody. *See People v. Cowart,* 244 P.3d 1199, 1204 (Colo.2010) (" [T]he lack of physical restraint suggests to us that Cowart was not in custody."); *People v. Breidenbach,* 875 P.2d 879, 886 (Colo.1994) ("One well-recognized circumstance tending to show custody is the degree of physical restraint used by police officers to detain a citizen."); *People v. Wallace,* 724 P.2d 670, 674 (Colo.1986) (finding that the defendant was not in custody where the officer's inquiry "was made in a normal tone of voice, and no restraints had been placed upon the defendant").

¶ 22 We have also observed that roadside detentions pursuant to routine traffic stops often do not implicate *Miranda* protections, due to their typically brief duration and lack of police-dominated atmosphere. *People v. Null,* 233 P.3d 670, 676 (Colo.2010); *People v. Archuleta,* 719 P.2d 1091, 1093 (Colo.1986) ("[T]he roadside questioning of a motorist detained pursuant to a routine traffic stop does not necessarily constitute 'custodial interrogation' for the purpose of the rule established in *Miranda.*"). In other situations, routine traffic stops may become custodial. *Null,* 233 P.3d at 676. "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." *Id.* (quoting *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

¶ 23 For this reason, we concluded the defendants were subjected to custodial interrogation in *People v. Taylor,* 41 P.3d 681 (Colo.2002), and *People v. Polander,* 41 P.3d

698, 705 (Colo.2001). In *Taylor,* an officer initiated a traffic stop of the defendant's vehicle upon knowledge that his passenger had outstanding warrants for her arrest. 41 P.3d at 683. After arresting the passenger, officers removed the defendant from the vehicle, physically escorted him to the rear of the car, frisked him, took four knives in his possession, and "essentially pinned" him against the vehicle so that he was not free to move without physically maneuvering around the officer. *Id.* at 692. An officer further restrained the defendant by extending an arm to prevent him from moving toward the passenger compartment. *Id.* At the time the defendant made incriminating statements, the trial court found that he was "essentially encircled" by armed, uniformed officers. *Id.* at 692–93.

¶ 24 In *Polander,* the police received a call-in report of suspected drug activity taking place in a Burger King parking lot at 10:48 p.m. 41 P.3d at 701. When officers arrived at the scene, they immediately observed two vehicles matching the caller's descriptions. *Id.* Upon approaching one of the vehicles and looking into the rolled-down driver's side window, the officers observed three individuals sitting in the back seat. *Id.* The driver identified himself to the officers at their request. *Id.* Because the driver's hands were in his pockets and the car contained a number of objects potentially adaptable as weapons, the officers asked all of the occupants to step outside. *Id.* An officer patted down the driver and recovered a small cylindrical object appearing to contain a narcotic. *Id.* The officer then handcuffed the driver and directed him to sit on a nearby curb. *Id.* While this interaction was ongoing, the second officer patted down the remaining two occupants and instructed them to sit on the curb, but did not handcuff them. *Id.* The officers were granted permission to search the car and discovered a spoon that appeared to have been burned, a razor blade, defendant Polander's purse, and a Crown Royal bag. *Id.* Both the purse and Crown Royal bag contained white, powdery balls suspected of being cocaine. *Id.* An officer asked the occupants to whom the Crown Royal bag belonged; Polander responded it was hers. *Id.* The police then

handcuffed and took her to the police station where she was advised of her *Miranda* rights for the first time. *Id.*

¶ 25 We concluded that, at the time Polander admitted ownership of the drugs in the van, she was in custody for *Miranda* purposes. *Id.* at 705. One of her companions had already been handcuffed, and the officers had discovered contraband in the vehicle, including inside her purse. Under these circumstances, it was "apparent to all that the police had grounds to arrest the occupants of the vehicle," and the defendant had every reason to believe she herself would be arrested rather than briefly detained and released. *Id.* Accordingly, we held that her freedom of action was restrained to a degree tantamount to formal arrest. *Id.*

¶ 26 With these precedents in mind, we must determine whether Pleshakov was restrained to the degree associated with formal arrest at the time Sergeant Redfearn questioned him. We conclude he was not.

## C. Application to this Case

¶ 27 The issue in this case is whether the police conducted custodial interrogation that required a Miranda warning. The trial court's suppression order largely relied upon two facts: (1) Sergeant Redfearn had specifically targeted Pleshakov as a suspect in drug distribution, and (2) there were four armed, uniformed officers present at the scene. In its oral findings, the trial court stated, "this is not just an investigative stop. When he decides, 'This is my guy' and he removes him from the other people–I'm not saying the detention was illegal, but I'm saying it was a detention and it was subject at that point to *Miranda* and he didn't Mirandize him."

¶ 28 The trial court's reliance on Sergeant Redfearn's subjective state of mind is erroneous. "[U]nder *Miranda*[,] a policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time[,] . . . rather, the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Stansbury v. California,* 511 U.S. 318, 323–24, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *see also People v. Black,* 698 P.2d 766, 768 (Colo.1985) ("The police officer's subjective state of mind is not an appropriate standard for determining whether an individual has been deprived of his freedom of movement in any significant way under the Fifth Amendment.")

¶ 29 During the initial stop, Sergeant Redfearn made no mention of his suspicions to any of the vehicle's occupants. He initiated the traffic stop by flashing his lights, approaching the driver's side window, and asking for the driver's identification. It was only upon the driver's inability to produce any identification, registration, or insurance that he asked whether the remaining passengers had identification. Until the point Sergeant Redfearn asked to speak with Pleshakov directly, and explained that he had multiple sources connecting Pleshakov to drug distribution, Pleshakov had no reason to suspect he was being detained for anything other than a routine traffic stop. Accordingly, Sergeant Redfearn's testimony regarding his private suspicions and the fact that he would not have allowed Pleshakov to leave the scene of the stop do not raise the interaction to the level of a custodial exchange.

¶ 30 Nor do the circumstances under which Pleshakov made incriminating statements support a finding of custody. Although there were four officers present at the scene, Sergeant Redfearn and Pleshakov conversed alone while the remaining officers engaged in other tasks. Pleshakov's conversation with Sergeant Redfearn took place in close proximity to his two companions. The tone of the interaction was conversational, none of the passengers were handcuffed, the officers did not brandish their weapons, and no physical force was exerted. *Cf. Taylor,* 41 P.3d at 692. The conversation took place in public view so that passersby could have witnessed the interaction. *See Berkemer,* 468 U.S. at 438, 104 S.Ct. 3138 (noting that "exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subject to abuse"). The duration of the conversation was ten minutes or less, after

which Pleshakov granted his consent for officers to search his residence.

■■■■■■ ¶ 31 The fact that Sergeant Redfearn confronted Pleshakov with witness statements regarding Pleshakov's alleged drug activities does not in itself constitute custodial interrogation.

> [W]hile notifying a person who has already been seized that he will be charged with an arrestable offense before being released may well elevate the seizure beyond an investigatory stop, merely confronting a suspect with the evidence against him and threatening, no matter how confidently, to charge him with a crime at some point in the future does not, by itself, constitute an infringement on his liberty, much less the kind of infringement associated with a formal arrest.

*Figueroa–Ortega,* ¶ 10. In this case, there is no showing that Sergeant Redfearn informed Pleshakov he would be charged with an arrestable offense or that he presented Pleshakov with the evidence against him in a threatening or confrontational manner. Rather, the record reveals that Sergeant Redfearn simply informed Pleshakov that he had witness statements connecting Pleshakov to drug use and distribution, that he believed he had enough information to obtain a warrant, and it would likely be easiest for everyone if Pleshakov granted consent for officers to search the apartment. A reasonable person would not perceive these statements to be the functional equivalent of an arrest.

¶ 32 Although the circumstances of this case are somewhat similar to those in *Polander,* there are several important differences rendering these cases distinguishable. In *Polander,* at the time the defendant made incriminating statements, one of her companions was already handcuffed and officers had recovered contraband both from the vehicle and from the defendant's purse. In that situation, it was "apparent to all that the police had grounds to arrest the occupants of the vehicle," and there was no reason for her to think she would simply be briefly detained and released. 41 P.3d at 705. Here, by contrast, none of the passengers were handcuffed, and, at the time Sergeant Redfearn asked to speak with Pleshakov, the only apparent violations were improper window tinting and the driver's inability to produce her driver's license, registration, and insurance.[5] Further, the interrogation in *Polander* took place late at night, whereas the exchange in this case took place in the early evening hours of August–when it was still daylight–on a sidewalk, in plain view of any person who might be passing by. Pleshakov was not confined or encircled by officers, nor did the police brandish their weapons, use handcuffs, or otherwise exhibit the type of force generally associated with arrest.

¶ 33 Under these circumstances, we cannot conclude that a reasonable person in Pleshakov's position would believe that he was restrained to a degree associated with formal arrest. Absent such a deprivation of freedom, Pleshakov was not subjected to custodial interrogation when he made the incriminating statements to Sergeant Redfearn, and *Miranda* warnings were not required. Accordingly, Sergeant Redfearn's interrogation was not illegal, and the trial court erred by suppressing Pleshakov's statements.

¶ 34 The trial court determined that Pleshakov's consent was "mixed up within that interrogation I found to be illegal, so the consent to search is invalid." Because we conclude that custodial interrogation did not occur in this case, we also set aside the trial court's ruling invalidating Pleshakov's consent to search.

### III.

Accordingly, we reverse the trial court's suppression order.

---

5. Although the driver had a warrant for her arrest, there is no indication that this was communicated to Pleshakov. Even if Pleshakov was aware of this fact, it would not have provided reasonable grounds for him to believe he would also be arrested. In addition, Sergeant Redfearn' s testimony at the suppression hearing reveals that the backseat passenger received a ticket for marijuana possession as a result of the stop. There is no information regarding what Pleshakov knew about her ticket at the time of his interaction with Sergeant Redfearn.