2013 CO 20

**The PEOPLE of the State of Colorado,
Plaintiff–Appellant**

v.

**Carlos BARRAZA, Defendant–appellee.**

**Supreme Court Case No. 12SA284**

Supreme Court of Colorado.

April 8, 2013

*Interlocutory Appeal from the District Court*, Adams County District Court Case No. 11CR2717 Honorable Thomas R. Ensor, Judge

Attorneys for Plaintiff–Appellant: Don Quick, District Attorney, Seventeenth Judicial District, Michael J. Milne, Senior Deputy District Attorney, Brighton, Colorado.

Attorneys for Defendant–Appellee: Douglas K. Wilson, Colorado State Public Defender, Elaina E. Shively, Deputy Public Defender, Brighton, Colorado.

En Banc

JUSTICE HOBBS delivered the Opinion of the Court.

¶ 1 The prosecution brought this interlocutory appeal pursuant to C.A.R. 4.1 challenging the Adams County District Court's order suppressing Carlos Barraza's incriminating statements made prior to his first police interview at his home and his second interview at the police station after a *Miranda* advisement.[1] Barraza was charged with retaliation against a witness or victim, a felony, when he confronted residents of an apartment who had called the police on his friend, leading to his friend's arrest for trespass on a vehicle. The district court concluded that Barraza's

---

1. The prosecution presents the following two issues for review:

A. [Whether] [t]he district court erroneously determine[d] that the defendant was in custody for *Miranda* purposes when questioned outside his residence even though a reasonable person in the defendant's position would not believe himself to be deprived of his freedom of action to the degree associated with a formal arrest. Thus, did the court incorrect-

ly suppress the defendant's initial statement[?]

B. [Whether] [t]he trial court erroneously suppress[ed] the defendant's subsequent custodial statements made after a proper *Miranda* advisement and waiver, as tainted by his earlier statements, even though the court found that both of the defendant's statements were voluntary.

initial statements were the product of custodial interrogation without the benefit of *Miranda* warnings, and his subsequent statements were tainted by the failure to initially advise Barraza of his *Miranda* rights. The court suppressed both sets of statements, but found each to have been voluntarily given. We hold, under the totality of the circumstances, that Barraza was not subjected to custodial interrogation at the time he made his initial statements to the police, and, because the Mirandized statements at the police station were not fruit of the poisonous tree, the trial court erred in suppressing the statements. Accordingly, we reverse the district court's suppression order.

## I.

¶ 2 On August 3, 2011, just after 2:00 p.m., Thornton Police Detective Joseph Cahill responded to a harassment complaint at a Thornton apartment occupied by Rosa Hernandez, Elvia Villalba, and Gilbert Robledo. The complaint arose from an incident early that morning where Officer Cahill arrested Juan Guevara—who lived in the apartment above the three—in connection with a vehicle trespass on Hernandez's automobile. Hernandez's mother, Villalba, called the Thornton Police after repeated visits by a man claiming to be a police officer, who was upset over Guevara's arrest and made threatening statements to the three residents.

¶ 3 Hernandez told Officer Cahill that, at approximately 9:00 a.m., she heard someone knocking loudly on the front door, saying "Police. Open the door." Hernandez believed it to be Officer Cahill following up on the early morning incident and arrest of Guevara, but instead she discovered three Hispanic men at her door. One of the men asked who had called the police on his friend, and said someone was "going to pay." He told Hernandez that he would be back at 7:00 p.m. to find out who called the police.

¶ 4 At approximately 1:30 p.m., the same man with three other men returned to the apartment, again knocking on the door. Although all the residents were in the apartment, none answered the door. Hernandez claimed she was afraid the men would hurt her family. They heard the men go upstairs to where Guevara's mother lived. Hernandez then called the Thornton Police and Officer Cahill responded.

¶ 5 After Cahill interviewed all three residents, Villalba told him that she believed she had the threatening man's name from an incident six months earlier when his car struck Villalba's car. Villalba showed Officer Cahill a piece of paper that the man had left on her vehicle with his name, Carlos Barraza, and insurance information. Officer Cahill took the name, pulled Barraza's records, and, in his patrol vehicle, created a photographic lineup of six men, including Barraza. Cahill separately advised and displayed the photo lineup to each resident, and all three identified Barraza as the threatening man who came to the door.

¶ 6 Based on Villalba's information and the photographic lineup results, Officer Cahill used police records and went to Barraza's last known address. Thornton Officer Nau and two Westminster officers, whose jurisdiction the address was located in, joined Cahill at the residence. Cahill and Nau went to the door while the Westminster officers remained outside. Barraza's brother answered the door, let them in, and went to get Barraza, who was in his bedroom. When Barraza appeared, Cahill asked him if he would step outside to speak with him. Barraza agreed and the two went outside to the driveway. Barraza walked with a cane due to injuries sustained in a 2009 automobile accident. At the time Barraza and Cahill were speaking on the driveway, Officer Nau was between them and the front door, and the two Westminster officers were speaking to Barraza's family at the front door, about fifteen feet from Barraza.

¶ 7 Barraza and Cahill spoke about the incident and the allegations for about five minutes. Barraza explained he learned that Guevara had been arrested and did not believe Guevara had done anything wrong, as he had been with him the previous night. Barraza stated that he went to Guevara's apartment that morning and talked to Guevara's mother, who told him what happened, and that the downstairs neighbors called the police. Barraza admitted going to Hernan-

dez's apartment and asking Hernandez who called the police, but denied threatening anyone or claiming to be the police. Barraza also denied returning to the apartment at 1:30 p.m.

¶ 8 After Barraza made these statements, Cahill placed him under arrest. Following an approximately ten-minute drive to the police station, Officer Cahill advised Barraza of his *Miranda* rights. Barraza signed the advisement form, acknowledging that he understood these rights, and he also signed the waiver form, stating he was willing to discuss the facts of the case without counsel. Officer Cahill estimated that less than an hour elapsed between the time he first talked to Barraza at his home and the time he read him his *Miranda* rights at the police station.

¶ 9 Officer Cahill then conducted another interview with Barraza. Barraza reiterated his frustration about Guevara's arrest and said he was simply trying to figure out why Guevara was accused and arrested for the vehicle trespass. Barraza denied ever identifying himself as a police officer and also denied returning to Hernandez's apartment that afternoon.

¶ 10 The prosecution charged Barraza with retaliation against a witness or victim in violation of section 18–8–706, C.R.S. (2012), a class three felony. Barraza filed two motions, a motion to suppress identification and a motion to suppress statements. The district court suppressed the photo lineup identification. The motion to suppress Barraza's statements alleged that (1) Barraza was seized before his formal arrest when he was ordered to comply with police commands in his own home in violation of the Fourth Amendment; (2) the prosecution must prove compliance with *Miranda;* and (3) the prosecution must prove that Barraza's statements were voluntary.

¶ 11 The district court held a suppression hearing and concluded that (1) Barraza was "not free to leave," and, therefore, was in custody when being questioned on the driveway outside his home, and (2) statements made after the *Miranda* advisement were tainted by the failure to advise Barraza at the first interview of his *Miranda* rights. The district court suppressed both sets of statements. The court also concluded that Barraza had made both sets of statements voluntarily and they could be used against him in cross-examination or for rebuttal purposes.

¶ 12 The district court recognized that many of the indicia of custody did not apply in this case: "[Barraza] was not handcuffed. Police officers did not lay hands on him. Nobody pulled a gun on him. Nobody said you're under arrest until after he made a statement." In making its suppression determination, the district court focused on the presence of four police officers and Cahill's action in leading Barraza out of his house for the interview. The district court concluded that Barraza "was not free to leave":

> [Y]ou have police officers who do not just go to the door, they go inside the home, they get the defendant from his room, they take him from the home outside the home and separate him from his family. More importantly we have got four police officers from two jurisdictions. It's hard to say this is a citizen contact. It's pretty clear to this court that the defendant was not free to leave at that point in time.

¶ 13 The prosecution filed a notice of interlocutory appeal pursuant to section 16–12–102, C.R.S. (2012), and C.A.R. 4.1, contending that the trial court wrongly applied Fourth Amendment search and seizure standards to a Fifth Amendment inquiry.

## II.

¶ 14 We hold, under the totality of the circumstances, that Barraza was not subjected to custodial interrogation at the time he made his initial statements to the police, and, because the Mirandized statements at the police station were not fruit of the poisonous tree, the trial court erred in suppressing the statements. Accordingly, we reverse the district court's suppression order.

### A.  Standard of Review

¶ 15 Whether a defendant was subjected to custodial interrogation for purposes of *Miranda* presents a mixed question of law and fact. *People v. Pleshakov*, 2013 CO 18, ¶16, 298 P.3d 228, 232; *Mumford v. People,*

2012 CO 2, ¶12, 270 P.3d 953, 956. We defer to the trial court's findings of historical fact and will not overturn those findings if they are supported by competent evidence in the record. *People v. Guthrie*, 2012 CO 59, ¶10, 286 P.3d 530, 533. However, we review de novo the legal question whether those facts, taken together, establish that custodial interrogation occurred. *People v. Elmarr*, 181 P.3d 1157, 1161 (Colo.2008).

## B. Custodial Interrogation

¶ 16 The Fifth Amendment to the United States Constitution guarantees that "no person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Law enforcement officers are required to advise persons subjected to custodial interrogation that they have the right to remain silent; that anything they say may be used against them; that they have the right to the presence of an attorney; and that, if they cannot afford an attorney, one will be appointed for them. *Id.* Failure to provide these warnings and obtain a waiver of the subject's rights will preclude admission of his statements into evidence in a subsequent criminal prosecution. *People v. Matheny*, 46 P.3d 453, 462 (Colo.2002).

¶ 17 The fundamental inquiry in determining whether a suspect is "in custody" for the purposes of *Miranda* is "whether a reasonable person in the suspect's position would believe himself to be deprived of his freedom of action to the degree associated with a formal arrest." *People v. Polander*, 41 P.3d 698, 705 (Colo.2001). *Miranda* rights are implicated when police detain a suspect using a degree of force more traditionally associated with concepts of "custody" and "arrest" than with a brief investigatory detention. *Id.* (citing *People v. Breidenbach*, 875 P.2d 879, 887 (Colo.1994)). In making a custodial interrogation determination, a court must consider the totality of the circumstances under which the interrogation was conducted. *Mumford*, 270 P.3d at 957. Some of the factors courts consider in determining whether an interrogation was custodial in nature include:

> (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions.

*Matheny*, 46 P.3d at 465–66. This list is not exhaustive, *Mumford*, 270 P.3d at 957, and none of these factors alone is determinative, *Pleshakov*, ¶ 20. A "custodial" detention entails a greater restriction on freedom than that associated with investigative detentions under the Fourth Amendment. Under the Fourth Amendment, a seizure results when a reasonable person would not have felt "free to leave" or otherwise terminate an encounter with law enforcement. *People v. Stephenson*, 159 P.3d 617, 620 (Colo.2007).

## C. Application to this Case

¶ 18 In this case we address the admissibility of a criminal defendant's statements given both prior to and after police issued a *Miranda* warning. Applying the appropriate standard to this case, we conclude that Barraza was not subjected to custodial interrogation at the first interview, and, because Barraza received a *Miranda* warning at the police station, the district court improperly suppressed those statements as well.

¶ 19 The district court's suppression order relied upon the facts that the police questioned Barraza outside his home, away from his family and, "more importantly," that the presence of the four officers indicated Barraza "was not free to leave at that point

in time." However, as the trial court observed, many traditional indicia of a custodial interrogation were not present here—handcuffing, applying physical restraint, or informing Barraza that he was under arrest. Furthermore, the record shows that Officer Cahill spoke to Barraza in a conversational tone, did not force Barraza to answer any questions, and no officer removed his weapon during the incident.

¶20 In *People v. Pleshakov*, ¶15, under similar circumstances to Barraza's, we rejected a claim of custodial interrogation where the trial court suppressed statements made during a traffic stop. In *Pleshakov*, an informant tipped the police that the defendant was a marijuana dealer. Following a traffic stop, the police asked the defendant and the other vehicle passengers to step out of the car. An officer questioned the defendant separately from the other passengers, who the other officers remained with. The officer asked questions and presented the defendant with witness statements against him in a conversational tone, in public, for a relatively short period of time. The fact that there were four armed, uniformed police officers at the scene did not in itself require a conclusion that the defendant was in custody. *Id.* at ¶30. Under the totality of the circumstances, we concluded that a reasonable person would not perceive himself to be under restraint equivalent to a formal arrest. *Id.* at ¶33.

¶21 Similarly, in *People v. Klinck*, we ruled that custodial interrogation did not occur when the police questioned the defendant on his girlfriend's porch. 259 P.3d 489, 494 (Colo.2011). Although the police asked the defendant to remain on the porch until questioned, there were no physical restraints placed on him, the encounter lasted less than ten minutes, the officer used a conversational tone, and the defendant was calm and did not request termination of the interview. *Id.* at 494. We concluded that the general atmosphere of the questioning did not evince an attempt by the police to subjugate the defendant to the will of the police. *Id.*

¶22 At the time Barraza initially admitted going to Hernandez's apartment, Barraza had voluntarily come outside of his home to talk to Cahill, no officer had drawn his gun, Barraza was not in handcuffs, and no force was used against him. *See People v. Howard*, 92 P.3d 445, 452 (Colo.2004). We recognize an interview of one suspected of a crime will typically have an element of compulsion attached to it by virtue of the fact that the defendant may ultimately be charged with a crime. *See Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). However, the consensual interview between Officer Cahill and Barraza was not accompanied by the compulsive forces *Miranda* sought to prevent. *See Matheny*, 46 P.3d at 467 (concluding the police officer's use of persuasion during questioning was not coercive and not an "attempt to subjugate the individual to the will of the examiner").

¶23 Thus, we conclude that a reasonable person in Barraza's position would not believe that he was restrained to a degree associated with a formal arrest. Barraza was not subjected to custodial interrogation in the first interview; contrary to the district court's determination, therefore, the Mirandized second set of statements was not fruit of the poisonous tree. The district court erred in suppressing both sets of statements.

### III.

Accordingly, we reverse the district court's suppression order.