2014 CO 41

**The PEOPLE of the State of Colorado, Plaintiff–Appellant**

v.

**Bradley BEGAY, Defendant–Appellee.**

**Supreme Court Case No. 14SA18**

Supreme Court of Colorado.

May 27, 2014

Attorneys for Plaintiff–Appellant: Stanley L. Garnett, District Attorney, Twentieth Judicial District, Sean P. Finn, Chief Appellate Deputy District Attorney, Nicole A. Mor, Deputy District Attorney, Boulder, Colorado.

Attorneys for Defendant–Appellee: Douglas K. Wilson, Colorado State Public Defender, Eric Zale, Deputy State Public Defender, Boulder, Colorado.

JUSTICE HOOD delivered the Opinion of the Court.

¶ 1 In this interlocutory appeal, the People challenge the trial court's order suppressing statements made by defendant Bradley Begay in response to police questioning without a *Miranda* advisement. Because the trial court conflated the standards governing seizure under the Fourth Amendment and custody under the Fifth Amendment, we reverse.

## I. Facts and Procedural History

¶ 2 At approximately 10:30 p.m. on September 6, 2013, police officers responded to reports that a man called "Rabbit" tried to strangle two people in what is known as "Aids Park" in Boulder. The victims were familiar with their attacker and described him to Officer Anthony DiGiovanni as a six-foot Native American male, with shoulder-length black hair and tattoos on both arms, wearing a blue shirt and shorts. Witnesses told Officer DiGiovanni that the alleged assailant had walked off with another male called Bo. Officer DiGiovanni radioed this description to dispatch.

¶ 3 Soon after, three plainclothes officers in an unmarked patrol car observed two men matching the report who were crossing a bridge west of Aids Park. Officer Joel Burick exited the car, approached the men, and called out "Hey Rabbit." One of the men responded by approaching Officer Burick in a friendly manner and "almost hugged him as if he knew him." Officer Burick identified himself as law enforcement and asked the man to sit down for officer safety reasons. Noting that the man matched Officer DiGiovanni's description, Officer Burick asked for identification and learned that "Rabbit" was Bradley Begay. The officers alerted dispatch that they had located a possible suspect.

¶ 4 While Begay was seated on the ground, Officer Bryan Parch, one of the three officers at the scene, asked him, "What is it that you might have done that someone might confuse

you with an individual who had been involved in a strangulation?" Begay admitted to being present during an altercation at Aids Park, but he claimed that his companion Bo had been attacked and that he had intervened, ending the conflict. Bo, however, denied that any fight took place.

¶ 5 While Begay talked with Officer Parch, one or two other officers stood nearby. Begay was not handcuffed. The officers had firearms but never drew them; it is unclear from the record whether they were visible. Officer Parch testified that he made no threats or promises to Begay. The officers did not tell Begay that he was under arrest, nor did they say that he was free to leave. Begay never tried to stand or leave during their conversation. Approximately 20 minutes after he received the initial dispatch call to Aids Park, Officer DiGiovanni arrived at the scene with one of the alleged victims, who identified Begay as his assailant. Officers then read Begay his *Miranda* rights and arrested him.

¶ 6 Begay was charged with two counts of assault. Before trial, he moved to suppress the statements he made before his arrest as the product of custodial interrogation without a *Miranda* warning.

¶ 7 After testimony from Officers DiGiovanni and Parch, the court issued a bench ruling suppressing the statements. The court noted that whether a defendant is in custody is an objective assessment, but then stated, "[I]f Mr. Begay had tried to leave on that day, my guess is he would not have been able to." The court concluded, "I do think that under the totality of the circumstances a reasonable person would not have believed that they were free to leave that situation and, therefore, I do find specifically that Mr. Begay was under arrest even if those words were not spoken at that time." The trial court followed up with a written order to the same effect.

¶ 8 The People appeal.

## II. Standard of Review

¶ 9 Determining whether a person is in custody for *Miranda* purposes is a mixed question of law and fact. *People v.* *Elmarr,* 181 P.3d 1157, 1161 (Colo.2008). We defer to the trial court's factual findings if they are supported by the record. *Id.* But we review the custody determination de novo. *People v. Matheny,* 46 P.3d 453, 459 (Colo.2002). Our analysis is not limited to the factual findings which form the basis of the trial court's order; we may also consider undisputed facts evident in the record. *People v. Pleshakov,* 2013 CO 18, ¶ 16, 298 P.3d 228, 232; *Elmarr,* 181 P.3d at 1161.

## III. Analysis

¶ 10 The People concede that Begay's questioning constitutes interrogation, but they contend that he was not in custody until he was formally arrested. They argue that the trial court erred by applying the wrong legal standard when it analyzed whether Begay felt "free to leave" instead of whether a reasonable person in Begay's position would have believed himself to be deprived of his freedom to a degree associated with a formal arrest. We agree.

¶ 11 We begin by addressing the standard for determining whether a defendant is in custody for *Miranda* purposes—a standard that differs from the seizure standard under the Fourth Amendment. After discussing the nature of "show-up" identifications, we apply the correct standard, determine that Begay was not in custody, and reverse the trial court's suppression order.

### A. "Custody" Under *Miranda*

¶ 12 *Miranda v. Arizona,* 384 U.S. 436, 471, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), protects a defendant's Fifth Amendment right against self-incrimination by requiring police to provide an advisement before custodial interrogation. *Accord Matheny,* 46 P.3d at 462.

¶ 13 A suspect is in custody for purposes of *Miranda* if "under the totality of the circumstances, a reasonable person in the defendant's position would consider himself to be deprived of his freedom of action *to the degree associated with a formal arrest.*" *Id.* at 468 (emphasis added).

¶ 14 Under the Fourth Amendment, a seizure occurs when "a reasonable person

would not have felt 'free to leave' or otherwise terminate an encounter with law enforcement." *People v. Barraza*, 2013 CO 20, ¶ 17, 298 P.3d 922, 926.

■ ¶ 15 Thus, what constitutes "custody" for *Miranda* is narrower than what constitutes a "seizure" under the Fourth Amendment. *See People v. Hughes*, 252 P.3d 1118, 1121 (Colo.2011) ("We have previously recognized that even though a person may be 'seized' within the meaning of the Fourth Amendment, this does not necessarily mean that the suspect is 'in custody' for purposes of *Miranda*.") (internal quotations omitted); *People v. Polander*, 41 P.3d 698, 705 (Colo. 2001) ("[T]he [*Miranda*] question is *not* whether a reasonable person would believe he was not free to leave, but rather whether such a person would believe he was in police custody of the degree associated with a formal arrest." (citing 1 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 6.6(c), at 526 (2d ed. 1999))).

■ ¶ 16 A trial court errs by applying the "free to leave" standard in evaluating whether a suspect is in custody under *Miranda* doctrine. *See Barraza*, ¶ 18, 298 P.3d at 926 (applying "formal arrest" standard and reversing trial court's suppression order); *People v. Pittman*, 2012 CO 55, ¶ 1, 284 P.3d 59, 60 (concluding that trial court applied incorrect "free to leave" standard and reversing under "formal arrest" standard); *Hughes*, 252 P.3d at 1122 (same).

■ ¶ 17 In determining whether a defendant is in custody, courts should consider the following non-exclusive factors, none of which is determinative:

(1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions.

*Matheny*, 46 P.3d at 465–66.

■ ¶ 18 The *Miranda* custody determination is an objective reasonable person standard. *Id.* at 465. "[B]ecause the test of custody is an objective one, unarticulated thoughts or views of the officers and suspects are irrelevant." *Elmarr*, 181 P.3d at 1162; *accord Hughes*, 252 P.3d at 1121 (courts are guided by many factors, "none of which, however, are subjective"); *Matheny*, 46 P.3d at 457 (applying "formal arrest" standard and reversing trial court where decision to suppress "was based primarily on the subjective intent of the officers").

## B. Custodial Interrogation and "Show–Up" Identifications

¶ 19 In conducting a typical "show-up" identification, as here, patrol officers responding to a 911 call detain a suspect in the field for one-on-one viewing by the alleged victim. Under these circumstances, the police have unquestionably focused suspicion on the suspect. Multiple police officers are usually present, and a reasonable suspect may very well not feel free to leave. And, yes, if such a suspect tried to leave, he would almost certainly be stopped (although decades of cases have made clear that the subjective intentions of the officers are irrelevant to the custody analysis).

¶ 20 Is such a suspect seized under the Fourth Amendment? Typically, yes. Does that mean he is in custody under the Fifth Amendment? Not necessarily—investigatory detention of this sort may occur without the degree of restraint associated with a formal arrest. *See, e.g., People v. Young*, 923 P.2d 145, 150 (Colo.App.1995) (holding that defendant detained during proper investigatory stop and not arrested until after he was identified by the victim was not in custody before the identification for *Miranda* purposes).

■ ¶ 21 Whether a suspect detained for a "show-up" identification is in custody will of course depend on the totality of the circumstances surrounding the stop, including the length of time spent waiting for the witness

identification and whether the suspect is transported by police to the location of the witness. *See People v. Taylor,* 41 P.3d 681, 693 (Colo.2002) (lengthy detention in police-dominated atmosphere was factor indicating defendant was in custody); *see also Elmarr,* 181 P.3d at 1163 (finding transportation in the back of a police car significant to custody determination).

¶ 22 One of the hallmarks of a typical "show-up" identification, however, is that it occurs in public. In *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Supreme Court held that, although the defendant was seized under the Fourth Amendment, he was not in custody under *Miranda* when a highway patrol officer forced him to stop and get out of his car. The Court explained that during a typical traffic stop, a motorist does not feel "completely at the mercy of the police" because passersby can witness the interaction, and the public nature of a traffic stop mitigates the detainee's concern that he will be subjected to abuse or coercion by an "unscrupulous policeman." *Id.* at 438, 104 S.Ct. 3138. After all, "[t]he purposes of the safeguards prescribed by *Miranda* are to ensure that the police do not coerce or trick captive suspects into confessing" and to protect suspects from the "inherently compelling pressures" of custodial interrogation. *Id.* at 433, 104 S.Ct. 3138 (internal quotations omitted). Likewise, when a "show-up" identification occurs in a public place, the potential that police will use coercive tactics to compel a confession is diminished. *See, e.g., Jones v. State,* 132 Md.App. 657, 753 A.2d 587, 595 (2000) (holding that brief quasi-public questioning while waiting for a witness to do a "show-up" identification was not custodial interrogation under *Miranda* because it was similar to a traffic stop or a *Terry* investigative stop).

### C. Begay Was Not in Custody

¶ 23 In its bench ruling, the court focused on whether the officers would have allowed Begay to leave had he tried, and whether a reasonable person would have believed that he was free to leave the situation. The first of these considerations is an inquiry into the subjective intentions of the officers, and the second conflates the *Miranda* standard with the Fourth Amendment seizure standard. Both are incorrect.

¶ 24 The trial court found that Begay was in custody because "a reasonable person would not have believed that they were free to leave." In its written suppression order, the trial court cited both the "free to leave" and the "restraint commensurate with a formal arrest" standards, but ultimately concluded that "[u]nder a totality of the circumstances, the Court finds that a reasonable person would not believe he was free to leave in this situation." The trial court therefore applied the wrong standard in determining that Begay was in custody.[1]

¶ 25 Although Officer Burick curtailed Begay's freedom by requiring him to sit down, an officer's direction to stay put does not always equal restraint on a defendant's freedom of action to the degree associated with a formal arrest. For example, we held in *Mumford v. People,* 2012 CO 2, ¶ 4, 270 P.3d 953, 955, that a defendant was not in custody after officers patted him down, took his identification, and told him to sit on a curb before questioning him. This court found significant that although officers told Mumford that he was not free to leave, he was not subject to physical restraint and he was questioned "in a neutral area": the curb in front of his home. *Id.* at ¶¶ 17, 19, 270 P.3d at 958; *see also People v. Klinck,* 259 P.3d 489, 491–93 (Colo.2011) (holding that a defendant who was asked to follow a deputy

---

1. The trial court relied on *People v. Thiret,* 685 P.2d 193, 203 (Colo.1984), for the proposition that "[t]he question of custody turns on an objective assessment of whether a reasonable person in the defendant's circumstances would have believed that he was free to leave the officer's presence." United States Supreme Court cases, including *Berkemer,* 468 U.S. 420, 104 S.Ct. 3138, and *California v. Beheler,* 463 U.S. 1121,

103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), as well as numerous subsequent decisions by this court, have clarified that the standard for determining custody for *Miranda* purposes is whether the defendant's freedom is restrained to the degree associated with a formal arrest. To the extent that *Thiret* endorses the "free to leave" standard for a Fifth Amendment custody determination, it is no longer good law.

into a victim's house and then told to remain on the porch until the deputy returned to talk with him was not in custody for the purposes of *Miranda*).

¶ 26 To determine whether Begay was in custody before his formal arrest, we turn to the factors listed in *Matheny*: (1) the interrogation took place at approximately 11:00 p.m. in a lighted, open space just off a creek path, in an area "where cars can fit," behind a municipal building and near a public road; the purpose of the encounter was to ascertain whether the defendant was the person responsible for the alleged assaults; (2) three plainclothes officers were present during the interrogation, and Begay's companion Bo was also present at the scene; (3) Officer Parch asked an open-ended question, and Begay responded with a narrative; (4) the trial court observed that the officer's tone and manner were not "unduly harsh"; (5) the trial court found that the encounter lasted for approximately 20 minutes;[2] it is not clear exactly what portion of this time involved interrogation; (6) Begay was asked to take a seated position for officer safety; he did not try to get up and leave, nor was he ever told that he was free to do so; (7) the record does not indicate that Begay asked the officers any questions; and (8)–(9) the officers did not give Begay directions during the interrogation, although, as noted previously, one of them told Begay to sit down.

¶ 27 On balance, a reasonable person in Begay's position would not have considered himself deprived of his freedom of action to the degree associated with a formal arrest. Significantly, Begay was questioned in a public setting, near a road, where passersby could see him; he was neither patted down nor handcuffed; he was not told that he was under arrest but was merely asked to sit down; he was calm throughout the encounter and did not try to terminate the interview; and the encounter lasted for less than 20 minutes until Officer DiGiovanni arrived with an alleged victim for the identification. Under the totality of the circumstances, Begay was not in custody until officers formally

arrested him and read him his *Miranda* rights.

## IV.  Conclusion

¶ 28 We hold that Begay was not in custody under *Miranda* until he was formally arrested. Consequently, we reverse the trial court's suppression order and remand for further proceedings.

2. Officer DiGiovanni's testimony was that 20 minutes passed in total from receipt of the dis-

patch call to Aids Park and his arrival at the bridge for the "show-up" identification.