The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
May 20, 2021

## 2021COA69

**No. 17CA1745, People v. Alemayehu — Constitutional Law —
Fourth Amendment — Search and Seizures — Warrantless
Search — Plain View Exception**

A division of the court of appeals considers a rather intricate
Fourth Amendment issue involving the application of the plain view
seizure exception to justify a warrantless seizure and search of
several prescription pill bottles found in a compartment of an
opened car door. Because the division concludes that the police
illegally seized, then searched, the pill bottles, the illegal drugs
found therein must be suppressed and the matter remanded for a
new trial.

Otherwise, the division addresses issues pertaining to the
sufficiency of evidence to support a conviction for possession of a
controlled substance; the admissibility of statements purportedly

obtained from the defendant in violation of *Miranda v. Arizona*, 384

U.S. 436 (1966); the admission of footage from four deputies' body

cameras; and prosecutorial misconduct in closing argument.

COLORADO COURT OF APPEALS                                    **2021COA69**

Court of Appeals No. 17CA1745
Douglas County District Court No. 16CR1131
Honorable Shay K. Whitaker, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Henoke Alemayehu,

Defendant-Appellant.

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE DAILEY
Berger and Tow, JJ., concur

Announced May 20, 2021

Philip J. Weiser, Attorney General, Gabriel P. Olivares, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Karen Mahlman Gerash,
Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Henoke Alemayehu, appeals the judgment of conviction entered on jury verdicts finding him guilty of failing to report an accident and possession of a controlled substance (oxycodone).  In this case we consider the validity of a warrantless search and seizure of several prescription pill bottles found in a visible compartment of an opened car door.  Because we conclude that the police illegally seized and searched those bottles, we reverse Alemayehu's conviction for possession of a controlled substance and remand for a new trial on that count.  We otherwise affirm Alemayehu's conviction for failing to report an accident.

*I.     Background*

¶ 2     Alemayehu backed into another car in a Target parking lot, left a torn lottery ticket — instead of his name and phone number — on the other car's window, and parked twenty to thirty yards away in the same lot with the engine running.

¶ 3     A bystander reported the accident to a Douglas County Sheriff's deputy (Lieutenant Paul Rogers) who, along with another deputy, happened to be nearby responding to an unrelated accident.  Lieutenant Rogers approached Alemayehu and ordered him to turn off his engine.  Instead, Alemayehu got out of his car,

leaving the driver's side door open and his engine still running. When Alemayehu told Lieutenant Rogers that he had "left a note," Lieutenant Rogers responded that the note had no information on it. Alemayehu then said that he had mistakenly put the wrong piece of paper on the car he had hit. However, the second piece of paper that Alemayehu produced had a fake name and phone number on it.

¶ 4 Lieutenant Rogers called for backup and directed Alemayehu to stand and stay next to a shopping cart return. Other deputies arrived on the scene too. Lieutenant Rogers reached into Alemayehu's car and turned it off. At some point, it appears a deputy closed the car door. But, when asked for his registration and insurance, Alemayehu directed Deputy Jeff Creighton to the driver's sun visor area. Deputy Creighton then opened the driver's door again to look there.

¶ 5 Deputy Brad Proulx walked over to the open driver's door and looked at it. Inside a pocket at the bottom of the driver's side door, he saw unlabeled orange prescription pill bottles. He pointed them out to Deputy Creighton, who said, "Yeah, I saw these without any labels."

¶ 6     Deputy Proulx took three bottles out of the compartment and asked Alemayehu, "What are all these pills?"  After giving an evasive answer and being asked multiple times if the pills were his, Alemayehu denied ownership of the pills, saying, instead, that they belonged to a lawyer friend who had hurt his back, was taking medication, and had left them in the car.

¶ 7     Deputy Proulx opened the pill bottles, looked at the pills, and after researching their imprint code on his cell phone, determined that they were oxycodone.

¶ 8     Meanwhile, Deputy Creighton had walked to the passenger side of the car and looked in the glove box for Alemayehu's registration and insurance paperwork.  There, he came upon another bottle of pills.[1]

---

[1] At trial and at the suppression hearing, Deputy Creighton testified that this pill bottle also lacked a label and was one of the three bottles with oxycodone.  However, Deputy Creighton's body camera footage — which was admitted both at the suppression hearing and at trial — clearly shows that the bottle in the glove box was a fourth, labeled bottle and that, rather than opening it, he inspected its exterior and tossed it back into the car.

The three bottles identified at trial as containing oxycodone — and shown on the body cameras — all appear to have come from the compartment in the driver's side door.

¶ 9     The deputies then arrested Alemayehu.

¶ 10    At trial, Alemayehu did not testify or present any witnesses. His theory of defense, however, was that the deputies "made up their mind[s] very early that [Alemayehu] had committed a traffic crime" after talking to witnesses and before engaging with him. Regarding the controlled substance charge, he argued that he did not know the pills were a controlled substance.

¶ 11    The jury convicted Alemayehu as charged and he was sentenced to a term of two years' probation.

¶ 12    On appeal, Alemayehu contends that the trial court erred by (1) concluding that the prosecution had presented sufficient evidence to support a conviction on the possession of a controlled substance charge; (2) not suppressing evidence related to the discovery of oxycodone in his car; (3) not suppressing statements he made to the deputies in the parking lot; (4) admitting four DVDs of the deputies' body camera footage; (5) allowing prosecutorial misconduct during closing argument; and (6) responding to a jury inquiry.

¶ 13    We conclude that the evidence was sufficient to sustain Alemayehu's conviction for possession of a controlled substance.

But because his second contention has merit, we reverse that conviction and remand for a new trial on the underlying count. We reject all but the last of Alemayehu's remaining contentions, inasmuch as they could affect his conviction for failing to report an accident. As to the last contention, we do not address it because it is not likely to recur on retrial.

## II. Sufficiency of the Evidence

¶ 14 A person commits the crime of possession of a controlled substance if he *knowingly* possesses a controlled substance. § 18-18-403.5, C.R.S. 2020. "The 'knowing' element applies both to knowledge of possession, and to knowledge that the thing possessed is a controlled substance." *People v. Perea*, 126 P.3d 241, 244 (Colo. App. 2005) (citations omitted). It does not, however, require "that [a defendant] know the precise controlled substance possessed." *Id.* at 245.

¶ 15 Alemayehu contends the evidence was insufficient to sustain his conviction for possession of a controlled substance because (1) in his statements to the deputies, he "denied knowledge of the contents of the pill bottles" and "never affirmed knowledge of their

5

contents"; and (2) "the prosecution never proved he had such knowledge." We are not persuaded.[2]

¶ 16 Part of Alemayehu's contention appears to assume that the jury had to believe what he told the deputies. This is not the case. *Cf. People v. Kessler*, 2018 COA 60, ¶ 12 ("[A] fact finder is not required to accept or reject *a witness's* testimony in its entirety; it may believe all, part, or none of a witness's testimony. . . .") (emphasis added).

¶ 17 Further,

> [i]n assessing the sufficiency of the evidence supporting a guilty verdict, a reviewing court must determine whether any rational trier of fact might accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of guilt beyond a reasonable doubt.

---

[2] In a separate argument, Alemayehu contends that the court erred in admitting any evidence pertaining to the discovery of oxycodone in his car. In reviewing a sufficiency of evidence contention, an appellate court must consider evidence that should have been excluded at trial. *See, e.g., People v. Ramirez*, 155 P.3d 371, 377 (Colo. 2007) ("Whether the evidence is sufficient to support a judgment is a separate question from whether the evidence should be admitted in the first place."); *People v. Hard*, 2014 COA 132, ¶ 39 ("In assessing the sufficiency of the evidence, we must consider all the evidence admitted at trial, including the erroneously admitted evidence . . . .").

*People v. Atencio*, 140 P.3d 73, 75 (Colo. App. 2005).

¶ 18    In undertaking this analysis, we recognize that (1) "[a]n actor's state of mind is normally not subject to direct proof and must be inferred from his or her actions and the circumstances surrounding the occurrence," *People v. Joosten*, 2018 COA 115, ¶ 26 (citation omitted); (2) the prosecution must be given the benefit of every inference that may fairly be drawn from the evidence, *Kessler*, ¶ 12; (3) "[i]f there is evidence upon which one may reasonably infer an element of the crime, the evidence is sufficient to sustain that element," *id.* (quoting *People v. Chase*, 2013 COA 27, ¶ 50); and (4) "[w]here reasonable minds could differ, the evidence is sufficient to sustain a conviction," *People v. Bondurant*, 2012 COA 50, ¶ 58 (citation omitted).

¶ 19    When a "defendant has exclusive possession of the premises in which drugs are found, the jury may infer knowledge from the fact of possession." *People v. Yeadon*, 2018 COA 104, ¶ 25 (citation omitted), *aff'd and remanded*, 2020 CO 38.  "[K]nowledge can be inferred from the fact that the defendant is the driver and sole occupant of a vehicle, irrespective of whether he is also the vehicle's owner." *Id.*

¶ 20    Here, Alemayehu's knowledge that he possessed the pills and that they were a controlled substance can readily be inferred from the following facts: (1) he was the owner, driver, and sole occupant of the car; (2) he was in close proximity to the visible bottles of oxycodone in the driver's side pocket; and (3) his statements to the deputies indicated he was aware of the nature of the pills by attributing their ownership to someone else, noting their purpose was to relieve back pain, and intimating that he needed to move them out of view since he used the car for work.

¶ 21    The evidence was, then, sufficient to sustain Alemayehu's conviction for possession of a controlled substance. *See, e.g.*, *Yeadon*, ¶¶ 27-29 (discovery of methamphetamine in driver's side pocket was sufficient to support driver's conviction for knowing possession of a controlled substance).

### III.    *Seizure and Search of Closed Prescription Bottles*

¶ 22    Alemayehu contends that the trial court erred by not suppressing evidence that, according to him, was obtained as a result of an illegal seizure and search of the pill bottles.  We agree.

¶ 23    When reviewing a trial court's suppression ruling, we are limited to considering only evidence presented at the suppression

hearing.  *Moody v. People*, 159 P.3d 611, 614 (Colo. 2007); *accord People v. Bryant*, 2018 COA 53, ¶ 19.

¶ 24    The trial court's rulings present mixed questions of fact and law.  *People v. Gutierrez*, 2020 CO 60, ¶ 11.  Ordinarily, we defer to the trial court's findings of fact when they are supported by the record but review its legal conclusions de novo.  *People v. Pappan*, 2018 CO 71, ¶ 6 (search and seizure issues).  Our analysis is not, however, limited to the factual findings that form the basis of the trial court's order; we may also consider undisputed facts evident in the record.  *See Gutierrez*, ¶ 11.  Further, where pertinent circumstances

> "are audio- and video-recorded, and there are no disputed facts outside the recording controlling the issue of suppression, we are in a similar position as the trial court to determine whether the [evidence] should be suppressed."  Thus, we may undertake an independent review of the audio or video recording. . . .

*People v. Davis*, 2019 CO 84, ¶ 18 (quoting *People v. Kutlak*, 2016 CO 1, ¶ 13); *see People v. Chavez-Barragan*, 2016 CO 66, ¶ 5 n.1 (noting, in a search and seizure context, that the supreme court had "independently reviewed the [dashboard camera] recording as

we have done in other cases"); *People v. Platt*, 81 P.3d 1060, 1067 (Colo. 2004) ("When considering recorded statements — whether documentary, audio-taped, or video-taped — the trial and appellate courts are in a similar review position.").

### *A.     Facts*

¶ 25     Lieutenant Rogers and Deputies Creighton, Proulx, and Ryan Wolfe testified at the suppression hearing.  A DVD of footage captured on the four body cameras worn by them, and still photos from Lieutenant Rogers's and Deputy Proulx's body camera footage, were also admitted into evidence.

¶ 26     Even though Deputy Creighton can be heard saying in Deputy Proulx's body camera footage, "Yeah, I saw *these* without any labels" (emphasis added), the deputies' testimony at the hearing was that only "a bottle" lacking a proper label was clearly visible without having to be picked up or manipulated by them.  A still photo from Deputy Proulx's body camera footage shows two bottles (and perhaps a third).[3]  However, only one bottle in the photo visibly

---

[3] The still photo is attached to this opinion as Appendix A.  The pink lines on the photo were added by the division to show where the bottles were located.

has its label missing.  There is, so far as we can tell, no evidence of more than one bottle with its label visibly missing prior to Deputy Proulx picking them up and looking at them.

¶ 27     The trial court denied Alemayehu's motion to suppress evidence because

- From the one picture, a pill bottle in the "driver's side door" is visible and "does not contain a prescription label" but instead, "what appears to have been some type of either a torn label or some type of labeling or paper that was on that has since been removed."

- "Based on the officer's training and experience . . . that often illegal narcotics are kept in prescription drug containers . . . there was reasonable suspicion based on the [plain view] observation of that prescription bottle and the observation that the label on that prescription bottle had been removed for the officer to conduct further investigation regarding that particular pill bottle."

- "Upon that further investigation," the deputies learned that "the substance contained within that pill bottle is [oxycodone]."

¶ 28    The trial court also found that Deputy Creighton's subsequent search of Alemayehu's glove box was reasonable under *Arizona v. Gant*, 556 U.S. 332, 351 (2009), as a search of a car incident to arrest:

> [B]ased on the location of the original pill bottles in the door of the vehicle it would have potentially subjected the entire vehicle to a more thorough search, indicating that there was a reason to search for further evidence of a crime, having located the pill bottles in the door.

## B.    Analysis

¶ 29    The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures by law enforcement. *Gutierrez*, ¶ 13. A warrantless search or seizure is presumptively invalid unless justified by one of the established exceptions to the warrant requirement. *People v. Cattaneo*, 2020 COA 40, ¶ 17.

¶ 30    The People rely on the "plain view" exception, *see People v. Swietlicki*, 2015 CO 67, ¶ 18, combined (in the case of the pill bottle in the glove box) with a (type of) "vehicle paperwork" exception, *see People v. Pryor*, 896 N.Y.S.2d 575, 581-82 (Sup. Ct. 2009), to justify the deputies' seizure of the pill bottles. They rely on the

"automobile" exception, *see People v. Allen*, 2019 CO 88, ¶ 16, to justify their warrantless search of the pill bottles. *See, e.g., United States v. Murillo-Salgado*, 854 F.3d 407, 417 (8th Cir. 2017) (recognizing that a search of the concealed contents of a seized container must be either accompanied by a search warrant or justified by an exception to the warrant requirement); *United States v. Davis*, 690 F.3d 226, 233-34 (4th Cir. 2012) (same); *United States v. Jackson*, 381 F.3d 984, 989 (10th Cir. 2004) (same).[4]

---

[4] The People relied on the "plain view" exception — but not the "vehicle paperwork" or "automobile" exceptions — in the trial court. *See People v. Aarness*, 150 P.3d 1271, 1277 (Colo. 2006) ("On appeal, a party may defend the trial court's judgment on any ground supported by the record, whether relied upon or even considered by the trial court.").

For good reason, the People do not rely on the trial court's alternative ground for upholding the deputies' seizure and searches of the pill bottles via the inventory exception: the People never attempted to show that an impoundment of Alemayehu's car before the discovery of the unlabeled pill bottles would have been reasonable, *see People v. Brown*, 2016 COA 150, *aff'd*, 2018 CO 27, much less that the car would have been impounded and inventoried pursuant to standard criteria in departmental regulations, *see People v. Milligan*, 77 P.3d 771, 776-77 (Colo. App. 2003).

### 1. Seizure of the Pill Bottles in the Driver's Side Pocket: the Plain View Exception

¶ 31    The People rely on the plain view exception as justification for the deputies' seizure of the pill bottles in the driver's side pocket.

> Under the plain view exception, a warrantless seizure of a container is reasonable for Fourth Amendment purposes if police observed the container in plain view and if the seizure satisfies three requirements: (1) the police were lawfully in the position from which they viewed the container, (2) the incriminating nature of the container was immediately apparent, and (3) the police had a lawful right of access to the container.

*Swietlicki,* ¶ 19.

¶ 32    However, the fact that a container is lawfully seized under the plain view exception does not automatically mean that it may be opened and searched without a warrant.  The Fourth Amendment provides protection to the owner of a container that conceals its contents from plain view, and a search of the concealed contents of a seized container must be either accompanied by a search warrant or justified by an exception to the warrant requirement.[5]  *Jackson,*

---

[5] Although the pill bottle here was translucent enough to see that it contained pill-shaped objects, it was opaque in that it concealed the specific appearance or identity of the pills.

381 F.3d at 989 (a container may be properly be searched without a warrant, independent of lawfulness of its seizure, if its contents are apparent or a "foregone conclusion"); *see also, e.g., Murillo-Salgado*, 854 F.3d at 417 (same); *Davis*, 690 F.3d at 233-34 (same); *Clay v. State*, 725 S.E.2d 260, 269 (Ga. 2012) (same); *State v. Holmes*, 139 N.E.3d 574, 590 (Ohio Ct. App. 2019) (same); *State v. Cardwell*, 778 S.E.2d 483, 492 (S.C. Ct. App. 2015) (same); *Vassar v. State*, 99 P.3d 987, 995 (Wyo. 2004) (same).

¶ 33    Alemayehu does not dispute that the first and third elements of the plain view seizure exception were satisfied. His argument is with the application of the second element, that is, whether the incriminating nature of the plainly visible pill bottles was "immediately apparent" to the deputies.

> A naked reading of this phrase could fairly lead to the conclusion that, for the incriminating nature of an object to be "immediately apparent," the seizing officer must experience a split-second revelation — a product not of thought but of reflex — in which he *knows*, at the moment he lays eyes upon the object, that the object is incriminating. But more than three decades of jurisprudence conclusively forecloses such an interpretation.
>
> Instead, the Supreme Court has long equated this language to probable cause. More

15

> specifically, what has been required is that the
> seizing officer have "probable cause to
> associate the item with criminal activity
> without conducting a further search."

*Swietlicki*, ¶¶ 21-22 (citations omitted); *see* 2 Wayne R.

LaFave, *Search & Seizure: A Treatise on the Fourth Amendment*

§ 4.11(d), Westlaw (6th ed. database updated Sept. 2020) ("It must

be emphasized that the 'immediately apparent' requirement relates

only to probable cause, not certainty.  That is, if the police are able

to establish probable cause that the object is a fruit,

instrumentality or evidence of crime without [searching it], this is

all that is required . . . .") (footnotes omitted).

¶ 34    The trial court did not find that, upon discovering that the

prescription bottle was unlabeled, the deputies had probable cause

to associate it with criminal activity.  It found that the deputies had

"reasonable suspicion" to continue investigating the pills' nature.

¶ 35    "Reasonable suspicion" is not the same as "probable cause."

The reasonable suspicion standard is satisfied if the "police possess

some minimal level of objective suspicion (as distinguished from a

mere hunch or intuition)" that a person is committing, has

committed, or is about to commit a crime. *People v. Polander*, 41 P.3d 698, 703 (Colo. 2001).

¶ 36    Probable cause "is [a] more demanding [standard] than reasonable suspicion." *People v. McKnight,* 2019 CO 36, ¶ 51. Probable cause exists "when, under the totality of the circumstances, the objective facts and circumstances warrant the belief by a reasonable and prudent person, in light of that person's training and experience," that the object viewed is associated with criminal activity. *See People v. McKay*, 10 P.3d 704, 706 (Colo. App. 2000) (assessing probable cause to arrest).

> "The probable cause standard does not lend itself to mathematical certainties and should not be laden with hypertechnical interpretations or rigid legal rules." Instead, . . . we are required to "make a practical, common-sense decision whether a fair probability exists that a search of a particular place will reveal contraband or evidence of a crime." Thus, a fair probability does not refer to a "mathematical probability"; "[r]ather, probable cause must be equated with reasonable grounds." As such, a probable cause determination is "based on factual and practical considerations of everyday life on which reasonable and prudent people, not legal technicians, act."

*People v. Bailey*, 2018 CO 84, ¶ 21 (alteration in original) (citations omitted); *see also Illinois v. Gates*, 462 U.S. 213, 232 (1983) ("[P]robable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules.").

¶ 37    Whether probable cause for a warrantless search or seizure existed is a question of law that we review de novo. *People v. Matheny*, 46 P.3d 453, 461 (Colo. 2002).

¶ 38    In evaluating probable cause, due consideration should be given to a law enforcement officer's experience and training. *Henderson v. People*, 879 P.2d 383, 392 (Colo. 1994); *see United States v. Guerrero*, 472 F.3d 784, 787 (10th Cir. 2007) (Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002))).

¶ 39    At the suppression hearing, Deputy Proulx testified that, based on his experience and training, people "can sometimes" carry illegal pills in pill bottles, so he'll "look to see if the name is to the person we're in contact with." Here, he could see, without having to

move the bottle, that there was "no label" on it and "it's illegal to have pills in a bottle without a label on it."

¶ 40    Neither the prosecution in the trial court nor the People on appeal, however, have identified a statutory provision prohibiting the removal or alteration of labels per se on prescription bottles.

¶ 41    Deputy Creighton testified about the significance of a missing label on a prescription pill bottle, too. When asked what a prescription pill bottle with a torn-off label indicated, he responded,

> Oftentimes it could be something as simple as the label being just torn accidentally but more often than not it is a situation where the pill container either belongs to someone else than the person in possession of it or the substance inside the pill container is no longer the same substance that was originally prescribed in the container.

¶ 42    The People assert that Deputy Creighton's "more often than not" scenario provides probable cause to believe that Alemayehu violated section 18-18-413, C.R.S. 2020, which states,

> [a] person to whom or for whose use any controlled substance has been prescribed or dispensed by a practitioner may lawfully possess it, but only in the container in which it was delivered to him unless he is able to show that he is the legal owner or a person acting at the direction of the legal owner of the controlled substance.

19

¶ 43 However, as Alemayehu points out,

> [t]he statute allows possession of a controlled substance so long as it is in the container in which it was delivered. But here, whether the bottles contained a controlled substance is the query, and the deputies did not know and could not learn their contents absent further investigation beyond what [they could see].

¶ 44 Deputy Creighton did agree that, based on his training and experience, "it would be reasonable to say there may be illegal drugs or narcotics in that pill bottle."

¶ 45 But did that testimony warrant a finding of probable cause to believe the pill bottles were associated with criminal activity?

¶ 46 To be sure, there is something to be said for the idea that "[a] prescription bottle bearing anything other than the defendant's name would indicate that the defendant is in possession of drugs belonging to someone other than himself." *State v. Grevas*, 881 N.E.2d 946, 953 (Ohio Ct. Com. Pl. 2007) (concluding that this circumstance alone "gave the officer the requisite probable cause to seize the prescription bottles").

¶ 47 But most authorities reject the idea that an unlabeled pill bottle, in and of itself, constitutes probable cause for a search or seizure. *See State v. Meichel*, 290 So. 2d 878, 880 (La. 1974) ("[T]he

20

testimony of the officer making the seizure is clearly to the effect that he did not know the nature of the pills until after he had picked up the bottle and examined it. He did not know at the time he saw the pills that there was a probability that they were contraband and probably evidence."); *see also United States v. Crawford*, No. 3:19-CR-65-TAV-DCP, 2020 WL 2029959, at *9 (E.D. Tenn. Apr. 6, 2020) (unpublished report and recommendation) ("[T]he Court does not find that the 'intrinsic nature' of the pill bottle [with its wrapper torn and partially off] led to probable cause to believe that it is contraband. Even if the pill bottle appeared suspicious to law enforcement, further investigation would have been required to establish probable cause as to its association with criminal activity.") (citations omitted), *adopted*, 2020 WL 2025612 (E.D. Tenn. Apr. 27, 2020) (unpublished order); *United States v. Cooks*, 222 F. Supp. 3d 965, 966-72 (D. Kan. 2016) (officer finding pill bottle with missing label in console created only a reasonable articulable suspicion of criminal activity); *People v. Williamson*, 608 N.E.2d 943, 950 (Ill. App. Ct. 1993) ("While there is a chance a prescription bottle [without the defendant's name on it] may contain a controlled substance, it is equally, if not more, likely to contain a

number of innocent objects such as a valid prescription, aspirin, thumbtacks or nothing at all. Probable cause requires more than simply having seen an item associated with criminal activity on an earlier occasion."), *abrogated on other grounds by People v. Gipson,* 786 N.E.2d 540 (Ill. 2003); *Corwin v. State,* 962 N.E.2d 118, 124 (Ind. Ct. App. 2011) ("The altered label might create reasonable suspicion to further investigate the identity of the true owner of the bottle. But the State has not demonstrated the altered label created probable cause to arrest [defendant] for illegal possession of a controlled substance *before* [the officer] opened the bottle to see the pills."); *Commonwealth v. Hudson,* 92 A.3d 1235, 1243 n.6 (Pa. Super. Ct. 2014) (In a case involving police observation of two prescription pill bottles with their labels partially removed, the court stated, "[i]n none of the above-cited cases did the courts find that the mere observation of a container or package, the likes of which an officer has known, in the past, to contain narcotics, was sufficient to establish probable cause."), *abrogation on other grounds recognized by Commonwealth v. Byrd,* 185 A.3d 1015 (Pa. Super. Ct. 2018).

¶ 48    Most of the authorities require other "unusual" circumstances in addition to these types of pill bottles to support a finding of probable cause. *See State v. Cheatwood*, 267 So. 3d 882, 887-88 (Ala. Crim. App. 2018) ("The surrounding circumstances, namely, the fact that [the defendant] smelled of alcohol, that he admitted to drinking alcohol, and that he was passed out in a public place, gave rise to a 'practical, nontechnical' probability that the unlabeled pill bottle he carried contained contraband.") (citation omitted); *Ball v. United States*, 803 A.2d 971, 982 (D.C. 2002) ("[A]lthough neither the officer's recognition of the object in appellant's pocket as a medicine bottle that could be used to conceal drugs nor appellant's conduct independently establish probable cause in this case, the combination of the officer's plain feel of the medicine bottle, the fact that the bottle was a large plastic container, the officer's experience with the packaging of narcotics in this kind of container and, most important, the defendant's numerous attempts to access the pocket where the medicine bottle was detected despite the officer's multiple orders to the contrary, satisfy us that the officer could reasonably infer that the medicine bottle contained contraband and was thus authorized to seize the medicine bottle from appellant's jacket

23

pursuant to the 'plain feel' exception to the warrant requirement.") (citation omitted); *State v. Miguel*, 263 So. 3d 873, 875 (La. 2019) (The officer was aware that the driver was driving with a suspended driver's license, the vehicle had a fraudulent license plate, the driver and his passengers all disclaimed ownership of the pill bottle, and the driver admitted that he recently smoked marijuana, which, "in conjunction with the suspiciously torn label, when weighed by an experienced law enforcement officer, provided probable cause to believe the prescription bottle contained contraband."); *State v. Renaudin*, No. 2007 KA 2359, 2008 WL 2065936, at *3 (La. Ct. App. May 2, 2008) ("The report of the defendant's erratic driving; the defendant's droopy, glazed eyes and slurred speech; and the veiled discarding of a pill bottle with a torn off label all contributed to the totality of the evidence supporting [the deputy's] probable cause.").

¶ 49 In light of these authorities, we conclude that the mere observation of an unlabeled prescription pill bottle did not provide the deputies with probable cause to associate it with criminal

activity.[6]  Consequently, unless there were other unusual circumstances which would have elevated the deputies' suspicion to probable cause, the deputies would have lacked the authority to seize the item for further inspection under the plain view exception.

¶ 50     The People assert that there were such "other" circumstances. They point to Alemaheyu's having "just been in an accident, left a fake name and number, [driven] to the other end of the parking lot,

---

[6] At trial, Deputy Proulx testified that "the first thing [he] noticed" about the open driver's side door was that there were "*multiple pill containers*" that "didn't have a label on them."  (Emphasis added.) And Deputy Creighton is overheard on Deputy Proulx's body camera footage saying, "Yeah, I saw these without any labels" before Deputy Proulx picked up the first bottle.

But both deputies testified at the suppression hearing that they had noticed only a bottle with a missing label.  Deputy Creighton testified that only "that bottle" caught his attention "from the way *it* was arranged and that the label had been torn off"; Deputy Proulx similarly testified that he saw "*a* pill bottle" with "no label on [it]." (Emphasis added.)

Had evidence been presented at the suppression hearing that the deputies had seen, without touching or otherwise moving anything in the driver's side pocket, multiple unlabeled pill bottles, we might have reached a different conclusion about the existence of probable cause.  But we have found no such evidence in the testimony, pictures, or body camera footage presented at the suppression hearing.  *See Moody v. People*, 159 P.3d 611, 616 (Colo. 2007) (When reviewing a trial court's suppression ruling, we are limited to considering only "evidence presented at the suppression hearing.").

and [failed] to comply with the deputies' requests. Thus, it would have been reasonable for them to believe that he was under the influence of a controlled substance."

¶ 51 We are not persuaded. Unlike slurred speech, inability to perform physical maneuvers easily, or even nonsensical actions or answers, the circumstances on which the People rely, hardly (much less naturally) point to someone who others would suspect to be under the influence of an intoxicating substance.

¶ 52 Consequently, we conclude that the trial court erred by determining that the deputies were authorized to seize (and, consequently, search) the pill bottles found in the driver's side pocket of Alemayehu's car.

### 2. Seizure of the Pill Bottle in the Glove Box: the Vehicle Documentation and Plain View Exceptions

¶ 53 What, though, about the pill bottle found in the glove box? The People argue that (1) the deputies' search of the glove box was justifiable under a type of "vehicle paperwork" exception and (2) the deputies' seizure of the pill bottle was proper under the plain view exception.

¶ 54    The propriety of a warrantless search of an automobile's glove box for vehicle paperwork has been approved in, for instance, New York, *see Pryor,* 896 N.Y.S.2d at 581-82, and New Jersey, *see State v. Terry,* 179 A.3d 378, 388 (N.J. 2018) (Consistent with the Fourth Amendment, "[w]hen the operator of a vehicle is unable or unwilling to produce the registration or ownership papers . . . [the police may engage in] a quick, pinpointed search for the documents in the glove compartment . . . .").

¶ 55    The California Supreme Court, however, has rejected this type of police action. *See People v. Lopez,* 453 P.3d 150, 152 (Cal. 2019) ("Considering the issue in light of more recent decisions from both the United States Supreme Court and our sister states, we now conclude that the desire to obtain a driver's identification following a traffic stop does not constitute an independent, categorical exception to the Fourth Amendment's warrant requirement.").

¶ 56    Even if we were to endorse this exception, it would not benefit the People in this case. Application of the exception would, at most, put the deputy in a legitimate position from which he could "plainly view" a pill bottle. But, as noted earlier, that does not automatically mean that he could pick up the pill bottle and search it. Its

incriminating nature had to be "immediately apparent," that is, the deputy had to have probable cause to associate it with criminal activity. *See Swietlicki,* ¶ 19. But, as discussed above, the lack of a proper label on a pill bottle[7] would not, in and of itself, have made its incriminating nature "immediately apparent" to the deputy.

¶ 57 Nor, contrary to the People's argument, would the deputies have had additional grounds for associating the pill bottle found in the glove box with criminal activity because (1) the deputies had seized the three unlabeled pill bottles in the driver's side pocket or (2) it was seized after Alemayehu had told Deputy Proulx that the initial unlabeled pill bottles contained someone else's medication. Both circumstances either involved or arose as a result of, and indeed were linked closely in time to, the initial, illegal seizure of the pill bottles in the driver's door. *See People v. Dyer,* 2019 COA 161, ¶ 27 ("[T]he caseworkers' observations, the paramedics' observations, and [the defendant's] statements during the hospital interview were all obtained by exploiting the caseworkers' and police officers' illegal entries into [the defendant's] home. The

---

[7] If, indeed, it was unlabeled. *See supra* note 1.

exclusionary rule therefore required suppression of all of this evidence.").

¶ 58     Consequently, the trial court also erred by determining that the deputies were authorized to seize — much less search — the pill bottle in the glove box.

*C.     Harmless or Reversible Error*

¶ 59     Because the error in admitting illegally seized evidence was one of constitutional magnitude, we must reverse unless we are persuaded that it was harmless beyond a reasonable doubt. *People v. Harmon,* 284 P.3d 124, 128 (Colo. App. 2011).  An error is not harmless beyond a reasonable doubt if there is a reasonable possibility that the defendant could have been prejudiced. *People v. Stroud,* 2014 COA 58, ¶ 6.

¶ 60     Here, the improperly seized oxycodone evidence was critical to the prosecution's case on the possession of a controlled substance count.  Consequently, the admission of that evidence cannot be considered harmless beyond a reasonable doubt. *See McKnight,* ¶ 60 (determining that an unconstitutional search was not harmless beyond a reasonable doubt where the search uncovered the drug evidence used to convict the defendant).  Thus,

Alemayehu's conviction for possession of a controlled substance must be reversed and the matter remanded for a new trial.

### IV.  *Alemayehu's Statements*

¶ 61    Alemayehu contends that the trial court erred in admitting statements the deputies obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).  We disagree.

¶ 62    Notably, we assess Alemayehu's contention under the same standards of review used in evaluating his search and seizure contention: the admissibility of his statements presents a mixed question of law and fact, and we may consider undisputed evidence and undertake independent review of audio and video recordings. *See Davis*, 2019 CO 84, ¶ 18.

### A.  *Facts*

¶ 63    From the testimony and the body camera footage introduced at the suppression hearing, we glean the following facts:

¶ 64    Upon approaching Alemayehu in the parking lot, Lieutenant Rogers directed him to "turn [his] car off."  Instead, Alemayehu got out of his car and left it running.  Lieutenant Rogers directed him to stand at a nearby shopping cart return.

¶ 65    Four other deputies arrived on the scene. At most, only three interacted with Alemayehu at any one time.[8]

¶ 66    A few times, Alemayehu started to walk away from the shopping cart return and was told by one or more of the deputies to "get back against the rail," to "[s]tay leaning against the rail," or to "[s]tay there."

¶ 67    Deputy Creighton asked about the torn lottery ticket that Alemayehu had left on the windshield of the car he'd hit: "[S]o you really thought this was a note? . . . Explain to me how you can put this in someone's car and not see that this is not a note." When Alemayehu responded that he had left the lottery ticket by mistake, Deputy Creighton said, "That's bullshit, dude, I'm gonna call it out, alright?" He added, sarcastically, "That's a good story, okay," in response to Alemayehu's attempted explanation. While Deputy Creighton looked for vehicle paperwork in the driver's sun visor area, as Alemayehu had suggested, Deputy Wolfe offered Alemayehu a "piece of advice": that "this particular cop really

_____

[8] One of them, Deputy Mark O'Harold, arrived later to take inventory of Alemayehu's car and did not, so far as we can tell, have any interaction with Alemayehu.

doesn't like being lied to." Deputy Wolfe also said, "We know exactly what happened . . . . It's all on tape so we know you're lying."

¶ 68    Deputy Creighton then questioned Alemayehu about the name "Danny" appearing on the note Alemayehu said he meant to leave on the windshield. When Alemayehu answered that "Danny" was his nickname, Deputy Creighton replied that "those level of lies you're getting yourself into aren't helping you, sir." After Deputy Creighton unsuccessfully attempted to contact someone at the phone number written on the same note, he told Alemayehu that he was "tired of excuses," had "listened to enough garbage already," and knew "this was horse crap."

¶ 69    Deputy Wolfe then interjected, "At this point, unless the truth comes out, I'm going to recommend that we start looking at attempting to influence a public official, which is a criminal act. Because that's a bunch of nonsense."

¶ 70    After the prescription pill bottles were found in the driver's side pocket, Deputy Proulx questioned Alemayehu about the type of pills, whether they were his, how he had gotten them, and whether he owned the car in which the pills were found. Alemayehu

admitted that he was the owner of the car. He said he did not know what the pills were, as he did not "do drugs" or take "any" medication and the pills belonged to a friend with an injured back who had left the pills in his car, so he moved the pills out of sight because he used the car for work.

¶ 71    The deputies arrested Alemayehu approximately seventeen minutes after first contacting him. They did not advise him of any constitutional rights until after they arrested him.

¶ 72    The trial court denied Alemayehu's motion to suppress his statements, finding that

- the statements were made "during the course of the investigation" into an "alleged hit-and-run accident";

- although several officers were present, "most of the officers, with the exception of Deputy Creighton" were "at a further distance from the defendant, some standing toward the back of the vehicle in question";

- "[t]he officers are also engaged in several other matters that are going on," such as speaking with the victim of the alleged hit-and-run, and locating the pill bottles in

33

the car, rather than "being up close or being with the

defendant specifically"; and

- "from the body cams themselves it doesn't appear to be

  anything coercive that that the police officers have done

  other than conducting their investigation and questioning

  the defendant regarding the situation and, in particular,

  on the piece of paper that was left on the victim's

  vehicle."

## B. Analysis

¶ 73    Under *Miranda*, the prosecution may not use in its case-in-

chief a statement obtained by law enforcement during custodial

interrogation unless the suspect was warned about and validly

waived certain Fifth Amendment rights.  384 U.S. at 444; *see People*

*v. Wood*, 135 P.3d 744, 749 (Colo. 2006) (same).[9]  Two prerequisites

must therefore exist before a *Miranda* warning is required: the

---

[9] "[T]he person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

defendant must be in custody and subjected to interrogation by law enforcement. *People v. Padilla*, 2021 CO 18, ¶ 15.

¶ 74     For good reason, the People do not dispute that Alemayehu was subjected to interrogation. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (Interrogation refers "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.") (footnotes omitted); *accord People v. Bonilla-Barraza*, 209 P.3d 1090, 1094 (Colo. 2009). Consequently, we limit our analysis to whether Alemayehu was in custody.

¶ 75     In the *Miranda* context, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Davis*, 2019 CO 84, ¶ 17 (quoting *Howes v. Fields*, 565 U.S. 499, 508-09 (2012)). A person is not, for *Miranda* purposes, in custody simply because a reasonable person in his or her position would believe he or she was not free to leave the presence of the police. *People v. Stephenson*, 159 P.3d 617, 620 (Colo. 2007). A person is in custody for *Miranda* purposes only

when a reasonable person in the suspect's position "would believe himself to be deprived of his freedom of action to the degree associated with a formal arrest." *Davis*, 2019 CO 84, ¶ 17 (quoting *People v. Hankins*, 201 P.3d 1215, 1218 (Colo. 2009)).

¶ 76 In deciding whether a reasonable person in the suspect's position would believe himself to be deprived of his freedom of action, a court considers the totality of the circumstances, including (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions. *Id.* at ¶ 19 (citing *Mumford v. People*, 2012 CO 2, ¶ 13).[10] "None of these

---

[10] The supreme court has recognized that these factors are of limited use to a *Miranda* custody determination because they primarily address whether a person has been "stopped" rather than

36

factors alone is determinative." *People v. Pleshakov*, 2013 CO 18,

¶ 20.

¶ 77     Alemayehu points to the following circumstances as indicative

of custody:

- Four uniformed and armed deputies were present.

- At times, three of them were standing with Alemayehu.

- The deputies had restrained his freedom of movement by

  ordering him to remain at a certain place (the shopping

  cart return).

- The deputies were accusatory and confrontational with

  him, as well as dismissive of the credibility of his

  responses and explanations.

- One of the deputies threatened to have him charged with

  attempting to influence a public servant.

¶ 78     The presence of four to five deputies would not, in and of itself,

lead a reasonable person to believe that he or she had been

---

whether he has been subjected to a degree of restraint associated
with an arrest.  *See People v. Figueroa-Ortega*, 2012 CO 51, ¶ 8.

subjected to restraint akin to a formal arrest.[11] *See People v. Barraza*, 2013 CO 20, ¶ 20 (holding the defendant was not in custody, despite the presence of four officers). And in *People v. Figueroa-Ortega*, 2012 CO 51, the supreme court rejected a trial court's determination that a detective had engaged in custodial interrogation when he "confronted the defendant with the evidence against him, indicated his confidence in the defendant's guilt and that he was merely seeking a confession, and told the defendant that he would be charged for the burglary":

> The extent to which a police officer's tone of voice and demeanor can be characterized as confrontational and accusatory is more typically relevant to the determination whether an encounter is consensual or is more appropriately categorized as one in which a reasonable person would feel he was not free to leave. And while notifying a person who has already been seized that he will be charged with an arrestable offense before being released may well elevate the seizure beyond an investigatory stop, merely confronting a

---

[11] This is particularly true since the deputies, for the most part, kept their distance and did not crowd Alemayehu. Most of his interaction was with only two of the deputies and he never interacted with more than three at one time. *Cf. People v. Pleshakov*, 2013 CO 18, ¶ 30 (holding that the defendant was not in custody because, "[a]lthough there were four officers present at the scene," the police officer and the defendant "conversed alone while the remaining officers engaged in other tasks").

suspect with the evidence against him and threatening, no matter how confidently, to charge him with a crime at some point in the future does not, by itself, constitute an infringement on his liberty, much less the kind of infringement associated with a formal arrest.

*Id.* at ¶¶ 9-10.

¶ 79    More pertinent, we think, are that the following occurred prior to Alemayehu's arrest.

- The deputies were investigating a report of a hit-and-run accident.

- The deputies spoke with Alemayehu for only about seventeen minutes, in a public place, in the middle of the day. *See People v. Begay*, 2014 CO 41, ¶ 27 (The defendant "was questioned in a public setting, near a road, where passersby could see him, . . . for less than [twenty] minutes . . . .").

- Alemayehu "was neither patted down nor handcuffed," *id.*, or otherwise touched.

- "[H]e was not told that he was under arrest" or would not be released. *See id.*

¶ 80    Considering the totality of the circumstances, we conclude that a reasonable person in Alemayehu's position would not believe he had been deprived of freedom of action to the degree associated with a formal arrest.  Because Alemayehu had not been subjected to "custodial" interrogation, then, the deputies were not required to advise him of his *Miranda* rights.  Consequently, the trial court properly determined that Alemayehu's statements were not inadmissible on *Miranda* grounds.

## V.    *Evidentiary Issues*

¶ 81    Alemayehu contends that the trial court reversibly erred by admitting into evidence at trial redacted footage from four deputies' body cameras.[12]  We disagree.

---

[12] As at the suppression hearing, footage was presented from the body cameras of Lieutenant Rogers and Deputies Creighton and Proulx.  Unlike at the suppression hearing, however, Deputy Wolfe, did not testify at trial nor was footage from his body camera admitted.  The footage from the fourth body camera admitted at trial came from Deputy O'Harold, who testified to inventorying Alemayehu's car after his arrest.  Deputy O'Harold had not interacted with Alemayehu at all; consequently, no statements were recorded on Deputy O'Harold's camera.  Indeed, he was alone and did not speak during the recording.

¶ 82    In footage from his body camera, Lieutenant Rogers is overheard saying to the victim of the accident that Alemayehu "doesn't want to cooperate" and saying to the witness that Alemayehu was "a piece of work."[13]

¶ 83    In footage from his body camera, Deputy Creighton is shown confronting Alemayehu about the lottery ticket and the "note" with a name and number on it.  He tells Alemayehu that his responses were "excuses," "B.S.," "horse crap," and that "these levels of lies that you're getting yourself into aren't helping you sir."  Then, Deputy Creighton asks Alemayehu, "[A]re we ready for the truth?"

¶ 84    Also in the footage from Deputy Creighton's body camera, Deputy Wolfe is recorded saying to Alemayehu, "At this point, unless the truth comes out, I'm going to recommend that we start looking at attempting to influence a public official, which is a criminal act.  Because that's a bunch of nonsense."

---

[13] Alemayehu's opening brief asserts that Lieutenant Rogers also said Alemayehu "doesn't want to accept responsibility."  However, we were unable to locate that phrase at or near the place in the footage cited by Alemayehu.  *See Pastrana v. Hudock*, 140 P.3d 188, 189 (Colo. App. 2006) ("[W]e will not search the record for evidence to support allegations of error.").

¶ 85    Alemayehu asserts that these parts of the footage contained (1) hearsay, the admission of which violated his constitutional right to confront adverse witnesses; and (2) impermissible comments about his veracity.

¶ 86    Because Alemayehu did not object to the admission of any of the body camera footage at trial, reversal is not warranted in the absence of plain error. *People v. Ujaama*, 2012 COA 36, ¶ 38.

¶ 87    Plain error is error that is both "obvious" and "substantial." *Hagos v. People*, 2012 CO 63, ¶ 14. For plain error purposes, to be "obvious," an error must ordinarily contravene (1) a clear statutory command; (2) a well-settled legal principle; or (3) Colorado case law. *Scott v. People*, 2017 CO 16, ¶ 16. "An error is substantial if it 'undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction.'" *People v. Koper*, 2018 COA 137, ¶ 43 (citation omitted).

### A.    *Hearsay and Confrontation*

¶ 88    "'Hearsay' is a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," CRE 801(c), and is

generally inadmissible unless it falls within an exception to the rule against hearsay, *People v. Phillips*, 2012 COA 176, ¶ 61.

> A statement made by a party is not hearsay if it is offered against that party. CRE 801(d)(2)(A). And statements offered for other purposes — such as showing the statement's effect on the listener or to give context to a defendant's statements — are not offered for their truth and are not hearsay.

*People v. Abad*, 2021 COA 6, ¶ 52; *see also, e.g.*, *People v. Faussett*, 2016 COA 94M, ¶ 47 n.8.

¶ 89    All but one of the deputies' statements referenced above were admissible as nonhearsay to provide context for Alemayehu's statements. And the admission of those statements did not implicate Alemayehu's confrontation rights. *See, e.g.*, *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) ("The [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."); *People v. Godinez*, 2018 COA 170M, ¶ 78 ("[T]he admission of nonhearsay does not implicate a defendant's confrontation rights under either the United States or Colorado Constitutions.").

¶ 90    These authorities and this line of reasoning would not, of course, apply to Lieutenant Rogers's statement to the victim of the

accident that Alemayehu "doesn't want to cooperate" and was "a piece of work." Even if that statement qualified as hearsay, however, its admission would not violate Alemayehu's confrontation rights, given that Lieutenant Rogers testified at trial and was subject to cross-examination. *See People v. Acosta*, 2014 COA 82, ¶ 82 ("Where a witness testifies at trial and is therefore subject to cross-examination, admission of the witness's prior out-of-court statements does not violate a defendant's Confrontation Clause rights."). Nor would its admission constitute plain error: in light of the other evidence in the case,[14] the error would not cast serious doubt on the reliability of Alemayehu's conviction for leaving the scene of an accident.

## B. Veracity Evidence

¶ 91 "A witness may not opine with respect to whether another person was telling the truth on a specific occasion." *People v. Cernazanu*, 2015 COA 122, ¶ 11.

---

[14] That is, the physical lottery ticket and fake number, the testimony of witnesses to the accident, and Alemayehu's own conduct when confronted by the deputies.

¶ 92    But that rule does not appear to have been crossed in any "obvious" manner here.

¶ 93    In *People v. Cardman*, 2016 COA 135, *cert. granted, judgment vacated, and case remanded on other grounds*, No. 16SC789, 2017 WL 1369883 (Colo. Apr. 10, 2017) (unpublished order), another division of this court rejected the identical argument made here. In that case, the "recording of the interview admitted at trial included the detective's assertions that he believed the victim and did not believe defendant's denials of the victim's allegations . . . ." *Id.* at ¶ 85. The division analyzed the problem thusly:

> In *Davis v. People*, 2013 CO 57, ¶¶ 1, 17, 310 P.3d 58, the Colorado Supreme Court held that a law enforcement officer may testify about his perception of a witness's credibility during an investigative interview if the testimony is offered to provide context for the officer's interrogation tactics and investigative decisions rather than as a comment on the witness's credibility. *It necessarily follows that similar statements by police officers made during the interrogation itself are admissible for the same purpose.*
>
> Here, the statements made by the detective during the interview fall within the purview of [*Davis v. People*, 2013 CO 57]. The detective told defendant numerous times during the interview that he did not believe him after defendant had denied certain sexual

45

> contact with the victim, and the detective also said that he believed at least some of the victim's allegations.

*Id.* at ¶¶ 88-89 (emphasis added).

¶ 94     We recognize that the division's judgment was vacated by the supreme court. But it was vacated on an entirely different ground (i.e., the voluntariness of statements to the police) from the one at issue here. With respect to the matter at issue here, we find the division's rationale persuasive and, adopting it as our own, conclude that Alemayehu is not entitled to reversal on this ground.[15]

---

[15] We note that Alemayehu also similarly challenges that part of Lieutenant Rogers's trial testimony where, again without any objection from the defense, Lieutenant Rogers answered "no" when asked if Alemayehu had "plausible" explanations for (1) why he hadn't pulled back into the same parking space he'd been in near the accident and (2) why he had left a piece of a lottery ticket on the car. Lieutenant Rogers's testimony may well amount to a comment on Alemayehu's truthfulness on another occasion. *Cf. People v. Gaffney*, 769 P.2d 1081, 1085-86 (Colo.1989) (holding inadmissible a doctor's testimony that a child victim's description of a sexual crime was "very believable"); *People v. Cook*, 197 P.3d 269, 276 (Colo. App. 2008) (holding that the trial court erred when it allowed an investigating officer to expressly state, on multiple occasions, that victims were "credible" in their accusations). But if error, it was not "obvious" (and hence, "plain") error, though, because of case law allowing police to testify about "why they took particular actions even if their testimony 'touches upon prohibited subjects.'"

46

¶ 95     Even though reversal is not warranted on this basis here, a cautionary warning is: a "course of investigation" type exception is not a blank check authorizing the admission generally of otherwise improper testimony by police officers.  *See People v. Vialpando,* 2020 COA 42, ¶¶ 62-66 (*cert. granted on other grounds* Oct. 12, 2020); *United States v. Cass,* 127 F.3d 1218 (10th Cir. 1977); 2 Kenneth S. Broun et al., *McCormick on Evidence* § 249, Westlaw (8th ed. database updated Jan. 2020).

## VI.     Prosecutorial Misconduct

¶ 96     Alemayehu contends that reversal is required because of prosecutorial misconduct.  We disagree.

¶ 97     During closing argument, the prosecutor, in discussing Alemayehu's interaction with the deputies, said, "He's walking away.  He's refusing to provide his information. . . .  He's escalating things to that point.  And then he subsequently starts manufacturing these lies, members of the jury, and —"

---

*People v. Godinez,* 2018 COA 170M, ¶ 78 (quoting *People v. Penn,* 2016 CO 32, ¶ 32); *see Davis v. People,* 2013 CO 57, ¶¶ 1, 17.  As explained above, Deputy Creighton testified that he confronts someone with their own inconsistent statements.  It is just as possible that the other deputies, such as Lieutenant Rogers, used the same tactic, which would make the statements nonhearsay.

¶ 98   At that point, defense counsel objected, and the trial court ordered the prosecutor to "[r]ephrase." The prosecutor then said Alemayehu "starts manufacturing these untruths. And the officers are responding to that. They're getting frustrated because he keeps telling them things that are just not the case."

¶ 99   Defense counsel did not object further or ask for any further relief.

¶ 100   On appeal, Alemayehu argues that the prosecutor committed misconduct when he asserted that he "start[ed] manufacturing these lies." He is correct. *See Crider v. People*, 186 P.3d 39, 41 (Colo. 2008) ("[I]t is improper for a lawyer to use any form of the word 'lie' in characterizing for a jury a witness's testimony or his truthfulness."). But he is not entitled to relief.

¶ 101   By ordering the prosecutor to rephrase the comment, the trial court sustained (without explicitly using that word) Alemayehu's objection to it. *See State v. Hartley*, 414 S.E.2d 182, 186 (S.C. Ct. App. 1992). Because Alemayehu requested no additional relief, we will not consider this alleged error further. *See People v. Douglas*, 2012 COA 57, ¶ 65 (declining to review allegedly improper comment

by prosecutor where the defendant's objection to the comment was sustained and he requested no further relief).

### VII.  *Jury Inquiry*

¶ 102    Finally, Alemayehu contends that the trial court erred by responding to a jury inquiry about the elemental instruction for possession of a controlled substance by simply redirecting the jury back to the original instructions.  Because, however, this issue affects only the possession of controlled substances conviction, which we have reversed, and we have no basis for assuming that the issue will arise on retrial, we do not address it.

### VIII.  *Disposition*

¶ 103    That part of the judgment pertaining to Alemayehu's conviction for possession of a controlled substance is reversed and the matter is remanded for a new trial on that count; that part of the judgment pertaining to Alemayehu's conviction and sentence for failure to report an accident is affirmed.

JUDGE BERGER and JUDGE TOW concur.

